# EXHIBIT P

1

1

2   UNITED STATES DISTRICT COURT

3   SOUTHERN DISTRICT OF NEW YORK

4   - - - - - - - - - - - - - - - - - - - -x

5   RANDY UMANZOR,

6           Plaintiff,

7           -against-                14 Civ. 9850
                                          (VSB)
8   NEW YORK CITY POLICE DEPARTMENT,

9

            Defendant.
10  - - - - - - - - - - - - - - - - - - - -x

11

12          DEPOSITION of DAVID LICHTENSTEIN, taken

13  by the Plaintiff pursuant to Subpoena, held at

14  the offices of The Harman Firm, 1776 Broadway,

15  New York, New York, on Wednesday, July 22, 2015,

16  commencing at 11:01 a.m., before Margaret M.

17  Harris, a Shorthand (Stenotype) Reporter and

18  Notary Public within and for the State of New

19  York.

20

21

22

23

24

25

2

A P P E A R A N C E S:

       THE HARMAN FIRM
           Attorneys for Plaintiff
           1776 Broadway
           New York, New York  10019

     BY:  WALKER HARMAN, ESQ.
         EDGAR RIVERA, ESQ.

       NEW YORK CITY LAW DEPARTMENT
       OFFICE OF THE CORPORATION COUNSEL
           Attorneys for Defendant
           100 Church Street
           New York, New York  10007

     BY:  JOSEPH LOCKINGER, ESQ.

ALSO PRESENT:

       Randy Umanzor

3

1

2                    IT IS HEREBY STIPULATED AND

3          AGREED that the filing and sealing of

4          the within deposition be, and the same

5          are hereby waived;

6                     IT IS FURTHER STIPULATED AND

7          AGREED that all objections, except as

8          to the form of the question, be and

9          the same are hereby reserved to the

10         time of the trial;

11                    IT IS FURTHER STIPULATED AND

12         AGREED that the within deposition may

13         be sworn to before any Notary Public

14         with the same force and effect as if

15         sworn to before a Judge of this Court;

16                    IT IS FURTHER STIPULATED that

17         the transcript is to be certified by

18         the reporter.

19

20

21

22

23

24

25

4

1

2                    (One-page document was

3             marked as Plaintiff's Exhibit 1 for

4             identification, as of this date.)

5                    (A three-page document was

6             marked as Plaintiff's Exhibit 2 for

7             identification, as of this date.)

8                    (A four-page document was

9             marked as Plaintiff's Exhibit 3 for

10            identification, as of this date.)

11                   (Health Grove document was

12            marked as Plaintiff's Exhibit 4 for

13            identification, as of this date.)

14                   (A three-page document was

15            marked as Plaintiff's Exhibit 5 for

16            identification, as of this date.)

17                   (Complaint was marked as

18            Plaintiff's Exhibit 6 for

19            identification, as of this date.)

20                   (Summons was marked as

21            Plaintiff's Exhibit 7 for

22            identification, as of this date.)

23                   (Answer was marked as

24            Plaintiff's Exhibit 8 for

25            identification, as of this date.)

5

1

2              (Verified Bill of

3          Particulars was marked as

4          Plaintiff's Exhibit 9 for

5          identification, as of this date.)

6              (Amended Verified Bill of

7          Particulars was marked as

8          Plaintiff's Exhibit 10 for

9          identification, as of this date.)

10             (Medical and Physical

11         Fitness Standards and Procedures

12         for Police Officer Candidate was

13         marked as Plaintiff's Exhibit 11

14         for identification, as of this

15         date.)

16             (A document Bates stamped

17         D000017 through D000018 was marked

18         as Plaintiff's Exhibit 12 for

19         identification, as of this date.)

20             (A document Bates stamped

21         D000019 through D000021 was marked

22         as Plaintiff's Exhibit 13 for

23         identification, as of this date.)

24             (A document Bates stamped

25         D000022 through D000024 was marked

6

1

2                       as Plaintiff's Exhibit 14 for

3                       identification, as of this date.)

4                            (A document Bates stamped

5                       D000026 through D000027 was marked

6                       as Plaintiff's Exhibit 15 for

7                       identification, as of this date.)

8   D A V I D   L I C H T E N S T E I N, called as a

9           witness, having been first duly

10          sworn/affirmed by Margaret M. Harris, a

11          Notary Public within and for the State of

12          New York, was examined and testified as

13          follows:

14   EXAMINATION

15   BY MR. HARMAN:

16           Q      Good morning.

17                  Could you please state your name

18   for the record.

19           A      David Lichtenstein.

20           Q      Could you spell that, please?

21           A      L-I-C-H-T-E-N-S-T-E-I-N.

22           Q      And do you have a middle name?

23           A      Ira, I-R-A.

24           Q      And have you ever been known by

25   any other name?

7

1                    Lichtenstein

2          A      No.

3          Q      Have you ever been deposed

4    before?

5          A      Yes.

6          Q      When?

7          A      Most recently within the last

8    three months.

9          Q      And what was the purpose of that

10   deposition?

11         A      Representing the Police

12   Department in a legal matter.

13         Q      And then prior to that, we are

14   going to go over each time you have been

15   deposed, so I'm going to come back to the most

16   recent time that you were deposed.

17                The time before that, working in

18   reverse order, when was the second most recent

19   time that you were deposed?

20         A      I would say two years ago.

21         Q      What was the purpose of that

22   deposition?

23                    MR. LOCKINGER:  Objection.

24                    You can answer.

25         A      It was an examination before

8

```
 1                        Lichtenstein
 2     trial for a malpractice action.
 3          Q      Were you a defendant in that
 4     action?
 5          A      I was one of multiple defendants.
 6          Q      Prior to the malpractice action?
 7          A      I wouldn't have exact knowledge
 8     as to dates and times, but I would estimate at
 9     some time during that same year in a Police
10     Department issue I was deposed.
11          Q      And then prior to that, we talked
12     about three -- withdrawn.
13                 How many times have you been
14     deposed?
15                      MR. LOCKINGER:  Objection.
16                      You can answer.
17          A      I can't give an exact number.
18          Q      Approximate.
19          A      Twenty times.
20          Q      And of those 20, how many
21     involved the Police Department?
22                      MR. LOCKINGER:  Objection.
23                      You can answer.
24          A      I would say 16.
25          Q      So let's talk about the other
```

9

                              Lichtenstein

1

2      four.

3                    Tell me about the four times that

4      you were deposed that did not involve the Police

5      Department.

6           A     Once again, I can't say for

7      certainty, but I'll say those were four

8      malpractice actions.

9           Q     So tell me about the examination

10     before trial that was two years ago.

11                    You were a defendant in an

12     action?

13          A     Yes.

14          Q     Who was the plaintiff?

15          A     I don't know that I can answer

16     that question legally.

17          Q     Is the case filed in court?

18          A     Yes.

19          Q     So what would prevent you from

20     answering that question?

21          A     I believe there might be privacy

22     concerns regarding the case.

23                    I'm not allowed to discuss until

24     the case is adjudicated.

25                         MR. HARMAN:  Let's go off

10

```
 1                     Lichtenstein
 2               the record.
 3                    (Discussion off the record.)
 4                    MR. HARMAN:  Back on the
 5               record.
 6    BY MR. HARMAN:
 7          Q     Who is the plaintiff in the
 8    matter that you were a defendant in that you
 9    have identified as having an examination before
10    trial two years ago?
11                    MR. LOCKINGER:  Objection.
12                    You can answer.
13          A     Greenberg.
14          Q     Greenberg is the last name of the
15    plaintiff?
16          A     Yes.
17          Q     And what's the individual's first
18    name?
19          A     I believe it's Irving.
20          Q     And was there just one plaintiff
21    in the action?
22          A     No, there were multiple.
23          Q     How many plaintiffs were in the
24    action?
25          A     I think six or seven.
```

11

1                         Lichtenstein

2            Q       Where is the action filed?

3            A       I believe it's filed in Queens

4    County.

5            Q       Are you represented by counsel in

6    that action?

7            A       Yes.

8            Q       Who is your lawyer or lawyers?

9            A       It's a Long Island firm.  I don't

10   remember the name.

11           Q       Did you tender the claim to your

12   malpractice carrier?

13           A       Yes.

14           Q       Who is your malpractice carrier?

15           A       I believe it's MMIC.

16           Q       And is your malpractice carrier

17   paying the defense costs or are you paying the

18   defense costs?

19           A       Malpractice is paying the defense

20   costs.

21           Q       Who are the other defendants?

22           A       There's a surgeon who I forget

23   his name, but he's expired.  There's a hospital,

24   Peninsula Hospital.  There's an infectious

25   disease specialist.  And I believe there were

12

```
1                         Lichtenstein
2    several other specialists involved.
3               I don't recall the names of the
4    doctors.
5         Q       Did you treat Irving Greenberg?
6         A       It was his wife.  His wife is
7    deceased.  She was the plaintiff, I guess.
8         Q       Did you treat his wife?
9         A       Yes.
10        Q       What's her name?
11        A       I think it's Elizabeth Greenberg.
12        Q       And do you know under what
13   circumstances she passed?
14                    MR. LOCKINGER:  Objection.
15                    You can answer if you can.
16        A       It's a very old case.  It's over
17   11 years old.
18               She had had a, possibly a
19   surgical misadventure with her gall bladder and
20   I was taking care of her in the intensive care
21   unit and she died of septic shock.
22        Q       And so are the plaintiffs her
23   relatives?
24        A       Her husband.
25        Q       You said there were six or seven.
```

13

                            Lichtenstein

1

2          A       I'm sorry, I thought you meant

3     defendants.

4          Q       Six or seven defendants and one

5     plaintiff and the plaintiff is the husband of

6     the deceased?

7          A       Yes.

8          Q       And you treated her in the

9     intensive care unit?

10         A       Yes.

11         Q       Did you diagnose her with any

12    conditions?

13                        MR. LOCKINGER:   Objection.

14         A       Yes.

15         Q       What conditions did you diagnose

16    her with?

17         A       Adrenal insufficiency, septic

18    shock, those were her two main diagnoses.

19         Q       Are there allegations in the

20    lawsuit that you misdiagnosed her?

21         A       Yes.

22         Q       And you say the matter is

23    ongoing?

24         A       Yes.

25         Q       It has not been resolved?

14

1                        Lichtenstein

2          A      No.

3          Q      Prior to your EBT in the

4    Greenberg matter, you testified to approximately

5    four times that you have been deposed.

6                 Are all of those that didn't

7    involve the New York City Police Department,

8    correct?

9          A      Yes.

10         Q      And of those, do you have

11   specific recollections of those being

12   malpractice actions?

13         A      Yes.

14         Q      Were you deposed in all of those?

15         A      Yes.

16         Q      So let's talk about the second

17   time that you were called.

18                      MR. LOCKINGER:  Objection.

19                      You can answer.

20         A      We are going --

21         Q      Back.

22         A      Backwards.

23         Q      So you told me about two years

24   ago in the Greenberg case you appeared for an

25   EBT.

15

1                          Lichtenstein

2                  When was the time prior to that?

3                  I'm taking it you have no

4       recollection of being deposed in the last two

5       years?

6            A     Once again, this is backwards in

7       time, so I may have the cases mixed up.

8            Q     I understand and appreciate that.

9                  So that the record is clear, you

10      are not definite on your memory and I'm only

11      asking you to tell me what you recall.

12           A     There was a Mr. London and the

13      allegation was failure to treat high blood

14      pressure.

15           Q     And you appeared for an EBT?

16           A     Yes.

17           Q     Was that matter resolved?

18           A     Yes.

19           Q     Do you know how it was resolved?

20           A     It was settled.

21           Q     Did you make any cash payments as

22      part of the settlement?

23           A     Yes.

24           Q     How about the third time?

25           A     I don't remember her last name,

16

1                        Lichtenstein

2      but it was, it was a person who had multiple

3      embolic strokes and the allegation was failure

4      to diagnosis endocarditis.

5              Q       What is endocarditis?

6              A       Endocarditis is an infection of

7      the heart valves.

8              Q       Did the patient pass?

9                      MR. LOCKINGER:  Objection.

10             A       Eventually, but not in regard to

11     the --

12             Q       The allegation?

13             A       The allegation, yes.

14             Q       And was that matter resolved?

15             A       Yes.

16             Q       And did you make a cash payment

17     as part of that resolution?

18             A       Yes.

19             Q       How about the fourth time?

20             A       The fourth time was, once again,

21     I don't remember the plaintiff's name, but it

22     was a similar allegation of failure to diagnose

23     endocarditis.

24             Q       Is endocarditis a --

25             A       Endo, E-N-D-O.

17

1                          Lichtenstein

2            Q        Is endocarditis, is that a

3     specialty of yours?

4            A        No.  It's a disorder that an

5     internist would have to deal with, internal

6     medical person.

7            Q        And did the patient pass?

8            A        No.

9            Q        And was the matter resolved?

10           A        Yes, it was settled.

11           Q        And did you make a cash payment

12    as part of that settlement?

13           A        Yes.

14           Q        Where was the action filed?

15           A        I believe it was filed in either

16    Long Island or in Queens County.

17           Q        And how about the third time, the

18    other incident involving the, involving

19    endocarditis?

20           A        I believe that was filed in

21    Queens County also.

22           Q        And approximately when did you

23    provide testimony as part of the third case

24    involving multiple embolic strokes?

25           A        Well over ten years ago.

18

1                        Lichtenstein

2          Q       And how about the fourth incident

3     also involving endocarditis?

4          A       Similarly 15 years ago, possibly.

5          Q       Now, let's talk about the 16

6     depositions you have given as part of your role

7     in the NYPD.

8          A       I would like to qualify that

9     statement, because I'm not an attorney.

10                 Multiple times I have had to meet

11    with legal counsel, but it wasn't as per

12    subpoena.  It would be either a federal matter

13    or it would be a City Council matter.

14                 So I don't know if they really

15    all count as what we are doing here today, but I

16    would have to meet with an attorney and at some

17    point I would have to appear in front of a

18    magistrate.

19         Q       I'm going to ask you about sworn

20    testimony.  So that could be in front of a

21    magistrate judge, it could be in front of an

22    administrative law judge, in front of a court

23    reporter in a conference room or a court

24    reporter in an office or at the Police

25    Department in front of a court reporter.

19

1                    Lichtenstein

2                    So the idea is that if there is

3    an individual in the room who is typing into a

4    laptop or into a court reporting machine or you

5    are being recorded in some way so that the

6    recording can be transcribed, I'm going to ask

7    you about those instances.

8                    Do you understand?

9         A    Yes.

10        Q    So is it still your recollection

11   that you have been deposed 16 times as part of

12   your role with NYPD?

13        A    It's more or less.  I'm not

14   testifying to an exact number.

15        Q    Would it be easier for you to go

16   in a reverse order or do you just want to tell

17   me about them as you recall them?

18        A    I think it's easier, and, once

19   again, I may omit because of my recollection.

20        Q    I understand.

21        A    At least half of these involved

22   department trials, and a department trial is

23   where a police officer has been charged with an

24   offense, in this case because I, and at that

25   time I was working for the special medicine

20

1                       Lichtenstein

2      district, it involved medical fraud or theft of

3      services, and those were in front of an

4      administrative law judge at One Police Plaza.

5                       One case involved somebody with

6      cervical spine disease.

7              Q       Could we go back for a second.

8                       You said about half involved

9      disciplinary trials; is that fair?

10             A       Yes.

11             Q       So disciplinary trials.

12                      And I take it there were

13     allegations that an employee of the department

14     and/or a police officer, just police officer or

15     any employee?

16             A       Only police officers.

17             Q       Police officers had committed

18     some kind of misconduct like medical fraud or

19     theft of services?

20             A       Correct.

21             Q       And you were providing testimony

22     on what?

23                      MR. LOCKINGER:  Objection.

24                      You can answer.

25             A       On investigations as to whether

21

1                        Lichtenstein

2      their medical claims were factual or fraudulent.

3           Q     Tell me every single instance

4      that you recall that someone claimed to have a

5      medical condition and you offered testimony that

6      they did not.  I want to know what the nature of

7      the condition was and what your position was on

8      the condition.

9                        MR. LOCKINGER:  Objection.

10                        You can answer.

11          Q     To summarize, the bulk were

12     either alterations in the cervical or lumbar

13     spine causing disability, and there were one or

14     two shoulder derangement issues, claims of

15     disability.

16                        Two officers claimed they had

17     shoulder disabilities, and I believe the bulk of

18     the other cases involved either lumbar or

19     cervical spine disc disease causing disability.

20                        Oh, I'm sorry, and one involved a

21     hand injury.

22                        Did any of them involve multiple

23     sclerosis?

24          A     No.

25          Q     Did any one of them involve any

22

1                          Lichtenstein

2    neurological disorders?

3          A       By extension, the cervical and

4    lumbar and wrist and shoulder claims all had

5    neuropathy or an alteration in sensation or

6    motor strength as part of their claim, yes.

7          Q       How about did any of them involve

8    neurological conditions not related to trauma?

9          A       Technically these were all claims

10   of job-induced injury, so they were all

11   associated with trauma.

12         Q       And none were not associated with

13   trauma?

14                       MR. LOCKINGER:   Objection.

15                       You can answer.

16         A       I'm sorry, say that again.

17         Q       They were all associated with

18   trauma?

19         A       Yes.

20         Q       Let's move on.

21                 Tell me about the other eight or

22   so.

23         A       The other eight, and there could

24   have been twice that many --

25         Q       Well, you said approximately 16.

MCM REPORTING SERVICE
(516) 775-5209

23

1                    Lichtenstein

2         A      It could have been 30.  I don't

3    have an independent recollection, sir.

4                 This has been over 15 years.

5         Q      So you worked --

6         A      For the Police Department --

7         Q      And you believe it could be

8    anywhere from 16 times to 30 times that you've

9    offered testimony?

10        A      Yes.

11        Q      Let's talk about those other

12   instances that you remember that didn't involve

13   providing testimony regarding a disciplinary

14   proceeding related to a medical disability.

15        A      The majority of those cases were

16   involved with hearing deficiency.

17                 There was one case of

18   fibromyalgia.

19                 There was a recent seizure

20   disorder where I was deposed.  I believe that

21   was the deposition, I think that was the most

22   recent deposition I gave.

23        Q      Two months ago?

24        A      It's a few months ago or a year

25   ago.  Once again, they all kind of merge

24

                              Lichtenstein

1

2      together in my head.

3              Q       Anything else you recall?

4              A       I'm trying to, I would say that's

5      the bulk of the claims that I had to deal with.

6              Q       In what context were you

7      providing testimony on a hearing disorder?

8                      MR. LOCKINGER:  Objection.

9                      You can answer.

10             A       For the last ten years I've been

11     in charge of candidate testing at the Police

12     Department and people who have been disqualified

13     have the right to an appeal.

14                     I'm also in charge of civilian

15     affairs, and as part of the civilian contract

16     with the city, they can apply for grants of lost

17     time, and I represent the department if there is

18     a dispute about not awarding grants to those

19     civilians.

20             Q       Civilian affairs oversees what

21     type of employee?

22             A       Anyone who doesn't have a

23     firearm.

24                     There's multiple titles in the

25     department, such as traffic enforcement, school

25

                        Lichtenstein

1

2    safety, PCT.

3         Q     Are there instances in which an

4    individual becomes a police officer and is no

5    longer a police officer, but falls under the

6    civilian affairs umbrella?

7         A     No.  The reverse is true.  They

8    may be civilians.

9         Q     And then become a police officer?

10        A     Yes.  Police officer is what is

11   called a competitive title.

12        Q     Meaning you have to take a test?

13        A     There has to be a certain amount

14   of college credits, they have to take a special

15   test, they have to have a certain level of

16   physical and mental fitness.

17        Q     And so had the Police Department

18   disqualified someone for entrance because of a

19   hearing condition?

20        A     Yes.

21        Q     And have you, was the decision

22   based on your analysis?

23                    MR. LOCKINGER:  Objection.

24                    You can answer.

25        A     Yes.

26

1                       Lichtenstein

2           Q       And were you offering testimony

3      as part of an appeal?

4           A       Yes.

5           Q       How did that appeal process work?

6      Do you remember the name of the individual, by

7      the way?

8           A       There's far too many persons.

9           Q       So you offered testimony on

10     multiple occasions regarding individuals who

11     were disqualified for hearing conditions?

12          A       Correct.

13          Q       Do you remember any names?

14          A       No.

15          Q       So tell me how the appeal process

16     worked and how it results and you provide

17     testimony.

18                  So the individual is

19     disqualified, I assume they get a letter?

20          A       The candidates come in and they

21     are tested, they are screened by one of our

22     officers, and if their audio threshold is

23     abnormal then we place them on review and they

24     go to an independent private, either audiologist

25     or ENT doctor, and then they provide an

27

```
 1                      Lichtenstein
 2    independent evaluation of that person's hearing.
 3                   If that still shows a severe
 4    deficiency, then at that point the candidate is
 5    disqualified and at that point they can mount an
 6    appeal.
 7          Q     But as part of this procedure,
 8    you send the individual to a private doctor
 9    outside the department?
10          A     Correct.
11          Q     And was that done in every single
12    instance in which you disqualified someone with
13    a hearing condition?
14                   MR. LOCKINGER:  Objection.
15                   You can answer.
16          A     Yes.
17          Q     And you ultimately provided
18    testimony because the individual appealed the
19    decision?
20                   MR. LOCKINGER:  Objection.
21                   You can answer.
22          A     Correct.
23          Q     And in the instances in which you
24    provided testimony related to an appeal
25    concerning a hearing condition, did any of the
```

                                                                    28

1                        Lichtenstein

2     individuals prevail on their appeal?

3                      MR. LOCKINGER:  Objection.

4                      You can answer.

5           A      Yes.

6           Q      Approximately how many?

7           A      One.

8           Q      Do you know the individual's

9     name?

10          A      I don't recall, but the

11    circumstances were that it was, it was a veteran

12    from Iraq who had an IAD explode by his head, he

13    had a relatively severe hearing deficiency on

14    one side, his other side was normal.  We went --

15    we were in the initial aspects of his appeal

16    where we actually appeared in front of a

17    magistrate, he provided new medical data at that

18    hearing and I reversed my decision and I

19    qualified him.

20          Q      When you say "magistrate," what

21    do you mean by that?

22          A      There is a panel of four or five

23    people appointed by the city to hear these

24    cases.

25                      I think it's called an OATH

29

1                          Lichtenstein

2    trial.

3            Q      Right, the administrative law

4    judges for the City of New York.

5                    I just wanted it to be clear.

6            A      If I'm unclear it's because, once

7    again, I just don't know the jargon.

8            Q      I understand.

9                    Tell me how, if at all, would you

10   factor in corrective devices in cases involving

11   someone with a hearing deficiency?

12                          MR. LOCKINGER:  Objection.

13                          You can answer.

14           A      The patrol guide clearly states

15   that you are not allowed to have any external

16   device that would interfere with your

17   performance as a police officer.

18                    And up until recently that was

19   pretty much our policy.

20                    However, we were just recently

21   overturned in court.

22           Q      And tell me what you know about

23   that.

24           A      It was somebody in the

25   management, he was a deputy inspector from

MCM REPORTING SERVICE
(516) 775-5209

30

Lichtenstein

1  internal affairs, and he had applied through his

2  insurance for a hearing aid, and because he's

3  still a uniformed member of the service, he was

4  placed on review and his hearing had, for one

5  reason or another, gone to the point where he

6  needed an external audio device, and he was

7  pensioned from the job, he had an ordinary

8  disability pension from the job and he

9  challenged it and he won in court and he's been

10  reinstated.

11         Q     What is his name?

12         A     I'm sorry, I'm not good with

13  names.

14              It's a matter of public record.

15         Q     And that was a case filed in

16  court against the New York City Police

17  Department for disability discrimination?

18                    MR. LOCKINGER:  Objection.

19                    You can answer, if you

20                    can.

21         A     I believe so, and I believe it

22  was 2014 or 2015.

23         Q     It was a recent case?

24         A     Yes.

31

1                         Lichtenstein

2          Q        What about, you said external

3     devices.

4                    What do you mean by that?

5          A        Crutches, braces, those kinds of

6     things.

7          Q        What about an implant?

8          A        No, it would -- implants

9     generally wouldn't qualify as an external

10    device.

11         Q        What about a small hearing aid

12    that you couldn't see?

13         A        The argument at the time, and we

14    have since changed our policy, was that that

15    could be knocked out during a struggle, so it

16    was still considered an external device.

17         Q        But the policy has been changed?

18         A        Yes.

19         Q        How about fibromyalgia, what

20    happened with that?

21         A        The person withdrew.

22         Q        They withdrew their appeal?

23         A        Yes.

24         Q        And you disqualified someone

25    because they have fibromyalgia?

32

1                          Lichtenstein

2          A      Yes.

3          Q      Is that a disqualifying

4   condition?

5                      MR. LOCKINGER:  Objection.

6                      You can answer.

7          A      Can I answer that in a broader

8   sense or do you want a specific answer to the

9   fibromyalgia question?

10         Q      I want an answer to my question.

11         A      In the case of the fibromyalgia

12  person, she was currently having a flare when

13  she applied for the job, but, generally

14  speaking, as of five years ago we got a

15  directive from the law department, we used to

16  have --

17                     MR. LOCKINGER:  Objection.

18         Q      You can tell me what the policy

19  is now without telling me what directives you

20  got from lawyers.

21         A      The policy now is that we do

22  not -- there is no absolute medical

23  contraindication to being a police officer, that

24  every case needs to be individually assessed.

25         Q      So there is no automatic

33

1                    Lichtenstein

2    exclusion for fibromyalgia?

3          A      No longer.

4          Q      Was there five years ago?

5          A      There were automatic exclusions

6    for certain medical disorders.

7          Q      And would that include MS?

8          A      Yes.

9          Q      When did that policy change?

10         A      Roughly five years ago.

11         Q      Before five years ago, you were

12   automatically excluding everyone with MS?

13                    MR. LOCKINGER:  Objection.

14                    You can answer.

15         A      Yes.

16         Q      And you were automatically

17   excluding everybody with fibromyalgia?

18         A      No.

19         Q      Tell me the conditions that you

20   are familiar with that resulted in automatic

21   exclusions five years ago.

22                    MR. LOCKINGER:  Objection.

23                    You can answer.

24         A      Seizure disorder, progressive

25   neurological disorders such as MS, Parkinson's

34

1                        Lichtenstein

2    disease, sickle cell anemia, the loss of one or

3    both limbs.

4                   It was a short list.

5         Q     It was, and this is the list?

6         A     Yes.

7         Q     Seizure disorders?

8         A     Seizure disorders, on medication.

9         Q     Seizure disorders, even if you're

10   on medication?

11        A     No, seizure disorder if you are

12   taking medication.

13                   If you are not taking medication,

14   then it wasn't an automatic disqualification.

15        Q     I'm not sure I understand.  I'm

16   sorry.

17        A     If you had a history of seizure

18   disorder and you're not taking pills, then it's

19   not an automatic disqualification.

20        Q     Why?

21        A     Because you don't have active

22   disease and the nature of that disorder is

23   sometimes it could just go away.

24        Q     So it's active?

25        A     Active.

35

1                      Lichtenstein

2          Q      And progressive neurological

3    disorders and you mentioned such as MS.

4                 Anything else?

5          A      Parkinson's disease.

6          Q      Parkinson's disease, sickle cell

7    and loss of one or more limbs, correct?

8          A      Yes.

9          Q      That's the full list, as you

10   recall?

11         A      Yes.

12         Q      A third category mentioned that

13   you have offered testimony related to seizure

14   disorders.

15                So tell me what you offered

16   testimony on related to seizure disorders?

17         A      There was a candidate who as I

18   recall was initially diagnosed as having

19   seizures after playing video games, was

20   successfully treated with medication, the

21   medication was withdrawn, and two years later

22   when that person was playing video games again

23   started having seizures.

24         Q      And what happened, were they

25   disqualified from being a police officer?

36

1                          Lichtenstein

2          A      Based on that, there was a

3    question of photostimulus --

4          Q      Right.

5          A      -- I referred that person to the

6    department neurologist.  I didn't make that

7    decision.

8                 The department employs other

9    doctors in other specialties and in that case,

10   because I had a question, I referred him to the

11   department neurologist and the department

12   neurologist disqualified him.

13                And although I have ultimate

14   authority, I agreed with him in that case.

15         Q      The individual who had the

16   seizure condition related to video games, do you

17   know his name?

18         A      No.

19         Q      Was the individual set for an

20   evaluation outside of the NYPD?

21         A      Yes.

22         Q      And so this individual was sent

23   to a department neurologist and someone outside

24   of the NYPD?

25         A      Yes.

                                                                    37
1                        Lichtenstein

2           Q        So two separate opinions?

3           A        Yes.

4           Q        And ultimately what was the

5      determination?

6           A        It's an open case.

7           Q        And any other seizure disorders

8      that you offered testimony related to other than

9      this one related to video games?

10          A        No.

11          Q        That's the only one?

12          A        Yes.

13          Q        Going back to the conditions that

14     resulted in automatic disqualifications five

15     years ago, what would happen in the instance of

16     someone was diagnosed with a progressive

17     neurological disorder after they became a New

18     York City police officer?

19                        MR. LOCKINGER:  Objection.

20                        You can answer, if you

21                   can.

22          A        If it came to our attention in

23     the medical division, because we have no way of

24     following officers unless they bring their

25     medical disorder to our attention, so they would

                    MCM REPORTING SERVICE
                       (516) 775-5209

38

Lichtenstein

1  either have to call out sick or independently

2  make us aware that they have a medical issue.

3  We don't screen them as full-duty police

4  officers for medical illnesses, they would have

5  to report it to us.

6          So if a member had an

7  exacerbation of their disorder and had been in

8  the hospital, then at that time their guns would

9  be removed and they would be placed on

10  restricted duty for one year.

11          If no new information was

12  forthcoming that would satisfy us in the medical

13  division that that officer could safely fulfill

14  all the duties, then they would be pensioned

15  from the job.

16     Q     So if I understand your testimony

17  correctly, a diagnosis after the commencement of

18  employment as a New York City police officer

19  wouldn't automatically result in termination or

20  in taking away duties?

21                MR. LOCKINGER:   Objection.

22     Q     Do you understand?

23     A     Yes.

24          And that answer is, it depends on

39

1                        Lichtenstein

2   how that disorder was reported.

3               For example, if it was reported

4   conversationally that the officer had been

5   diagnosed with MS and had been under therapy for

6   five years, six years, and was stable, then for

7   the most part no action would be taken by the

8   medical division.

9               On the other hand, if that

10  officer became acutely ill from the disorder, at

11  that point in time they would be removed from

12  full duty status and placed on restricted duty

13  until a one-year period of time during which

14  either that officer would recuperate or not

15  recuperate and then be sent to the pension

16  board.

17       Q       So, again, the Police

18  Department's knowledge of an MS diagnosis does

19  not, after someone commences employment as a

20  police officer, doesn't automatically result in

21  disqualification from active duty?

22                      MR. LOCKINGER:   Objection.

23       Q       It's a yes or no question.

24       A       Yes.

25       Q       And that was the policy five

40

1                          Lichtenstein

2     years ago?

3              A      Yes.

4              Q      Has the policy changed?

5              A      No.

6              Q      And you have testified that the

7     department had a neurologist on staff; is that

8     correct?

9              A      Yes.

10             Q      What is that individual's name?

11             A      I believe his name is Dr.

12    Maniscalco.

13             Q      Spell that, please?

14             A      I can't.  Maniscalco.

15             Q      And in how many instances in the

16    last year have you referred patients to Dr.

17    Maniscalco?

18             A      'scalco.

19             Q      'scalco.

20                       MR. LOCKINGER:  Objection.

21                       You can answer.

22             A      I would estimate ten times.

23             Q      And of those ten referrals, how

24    many of them were related to disqualifications

25    from the cadet program?

41

```
 1                    Lichtenstein
 2              MR. LOCKINGER:  Objection.
 3              You can answer.
 4        A      I'm not sure.
 5        Q      Any of them?  This is just going
 6    back the last year?
 7        A      I'm not sure.  I know there were,
 8    I know that there -- I believe there one or
 9    two specific MS cases within the last year or
10    two, and I don't remember if they were cadets or
11    police officer candidates.
12        Q      When you say there were one or
13    two MS cases in the last year, tell me what you
14    remember.
15        A      I remember that in those two
16    instances they were actually hired.
17        Q      Tell me what happened with the
18    first one.
19        A      I believe that the unifying
20    factor in both of those cases was that the
21    disease had a certain degree of longitude where
22    they were asymptomatic and cleared by their own
23    doctors.
24        Q      So I asked you about referrals
25    and you said there were ten, and you are
```

42

1                          Lichtenstein

2     testifying that two of them related to MS?

3          A      I believe so, yes.

4          Q      And of those they were

5     individuals that were either trying to enter the

6     cadet program or enter the department?

7                          MR. LOCKINGER:  Objection.

8                          You can answer.

9          A      Yes.

10          Q      And both those individuals were

11     offered entry into the department or the

12     program?

13                          MR. LOCKINGER:  Objection.

14                          You can answer.

15          A      Yes.

16          Q      And the reason, as you sit here

17     today, the reason you believe they were offered

18     entrance into the program is because they were

19     determined to be asymptomatic and they were

20     medically cleared by their doctors; is that

21     correct?

22                          MR. LOCKINGER:  Objection.

23                          You can answer.

24          A      They were asymptomatic over a

25     period of time and they had medical clearance

43

1                        Lichtenstein

2     from their neurologist.

3            Q      What period of time were they

4     asymptomatic?

5                        MR. LOCKINGER:  Objection.

6                        You can answer, if you

7                    can.

8            A      I believe one was five years and

9     the other may have been, I don't know, I recall

10    one of them being five years.  I don't exactly

11    recall the date, and I don't want to guess.

12                    But I will say around the same

13    time, within a five-year period.

14                        MR. HARMAN:  We are going

15                    to follow up with a writing, but

16                    we are going to ask for all

17                    records related to these

18                    instances where, I think it's

19                    easier rather than rambling on in

20                    the record about the documents

21                    that we want, but we are going to

22                    make some specific document

23                    demands and you can follow up

24                    with your lawyer, because we'll

25                    be submitting the document

44

```
1                        Lichtenstein
2                requests relating to transcripts
3                of deposition testimony and
4                people work related to
5                evaluations and referrals.
6                     I will just make that
7                simple record so that we don't
8                spend time today on that.
9                     We will put it in a letter
10               and serve some supplemental
11               requests.
12      Q      Is there a number of years, does
13  the department have a rule or regulation related
14  to the number of years you have to be
15  asymptomatic in order to qualify with respect to
16  an MS diagnosis?
17                     MR. LOCKINGER:  Objection.
18                     You can answer, if you
19               can.
20      A      There is no exact time period.
21               But --
22      Q      So the department doesn't have a
23  rule or regulation?
24      A      There is no rule or regulation.
25      Q      With respect to these two
```

45

1                              Lichtenstein

2      individuals, what prompted you to refer them to

3      the neurologist?

4            A       They were in good physical

5      condition with no neurological deficits, they

6      had very strong letters from their neurologist

7      that they were in remission, and a reasonable

8      amount of time had occurred since their last

9      episode.

10           Q       What's a reasonable amount of

11     time?

12                          MR. LOCKINGER:  Objection.

13                          You can answer.

14           A       For me it's three years, more or

15     less three years, and not much less.

16           Q       And in your professional

17     experience, how did you arrive at three years as

18     being a reasonable amount of time that someone

19     should be in remission?

20           A       Unfortunately, multiple sclerosis

21     is a progressive neurological disorder with no

22     cure.

23                   No medical authority can predict

24     how one person is going to do without a certain

25     amount of time going by.

46

1                          Lichtenstein

2                    Most studies about predicting the

3       body of remission time and disability usually go

4       from three to five years from when the person

5       was diagnosed.

6                          MR. HARMAN:  Can you read

7                    back the answer, please?

8                          (Whereupon, the record was

9                    read back by the reporter.)

10           Q      What studies are you referring

11      to?

12           A      I can't reference them at this

13      time.

14           Q      Can you name any study that talks

15      about three to five years?

16           A      Not at this time.

17           Q      All right.

18                    You have been deposed a lot, so

19      I'm only going to remind of the ground rules.

20                    First, my name is Walker Harman.

21      I'm an attorney and I represent Randy Umanzor,

22      who is the plaintiff in an action he's brought

23      against the New York City Police Department and

24      he's sitting here at the end of the table.

25                    For the record, have you ever met

47

```
1                        Lichtenstein
2     Mr. Umanzor?
3            A       No.
4            Q       Have you ever seen him in person?
5            A       I may have when he was at the
6     medical division, but I didn't examine him.
7            Q       You didn't examine him.
8                    Why do you say you may have seen
9     him?
10           A       I'm conducting physical exams in
11    the medical division, and the group of
12    candidates are usually in front of me at some
13    point or another.
14           Q       Did you ever speak with anybody
15    who examined him?
16           A       No.
17           Q       And you didn't refer him to a
18    neurologist?
19           A       No.  He was placed on review.
20                   I was going to -- generally
21    speaking, in these cases I'm going to go by the
22    private neurologist evaluation.
23           Q       You didn't refer him to the
24    department neurologist?
25           A       No.
```

48

1                        Lichtenstein

2          Q      And you didn't refer him to an

3    outside neurologist?

4          A      No.  I requested his records of

5    his own private neurologist.

6          Q      I'm going to ask, I have been and

7    will continue to ask you questions concerning

8    Mr. Umanzor's claims against the department.

9                 Do you understand that?

10         A      Yes.

11         Q      If you want to take a break

12   during the deposition, you can take a break.  I

13   would ask that you finish any pending question

14   before you take that break.

15                We should try not to interrupt

16   each other as best we can.  That's something

17   that we will both try to work on and I'll ask

18   you to verbalize any answers to any question

19   which you've been doing and I appreciate that.

20                You recognize that you're under

21   oath today?

22         A      Yes.

23         Q      And that failing to tell the

24   truth at a deposition is a crime called perjury.

25                Do you understand that?

49

1                         Lichtenstein

2          A      Yes.

3          Q      What is your date of birth?

4          A      2/3/1955.

5          Q      What's your home address?

6                  MR. LOCKINGER:  Objection.

7                  You can serve a subpoena

8                  on us and we will accept it.

9                  MR. HARMAN:  Are you

10                 directing him not to answer the

11                 question?

12                 MR. LOCKINGER:  Yes.

13         Q      To what address do you report to

14   work?

15         A      I believe it's 1 Lefrak Plaza.  I

16   don't know the exact address actually.

17         Q      Are you currently employed?

18         A      Yes.

19         Q      Do you have multiple, are you

20   employed by multiple entities?

21         A      Yes.

22         Q      How many?

23         A      Three.

24         Q      Tell me about the first one.

25         A      I work for the New York City

50

                          Lichtenstein

1

2    Police Department.

3          Q      What's your job?

4          A      I'm in charge of candidate

5    testing and civilian affairs.

6          Q      What's your job title?

7          A      I am deputy chief surgeon.

8          Q      Is that a full-time job?

9          A      No.

10         Q      It's part time?

11         A      Yes.

12         Q      Does it have a certain amount of

13   hours associated with it?  Are you required to

14   work certain hours?

15         A      I think there's a minimum, but

16   there's no real time involved.  It's as per the

17   needs of the department.

18         Q      How long have you held that

19   title?

20         A      December 5, 2001.

21         Q      And were you appointed to that

22   position?

23         A      Yes.

24         Q      Who appointed you?

25         A      I think it was Commissioner

51

1                          Lichtenstein

2    Kerik.

3          Q      Have you ever been disciplined by

4    the NYPD?

5                       MR. LOCKINGER:  Objection.

6                       You can answer.

7          A      No.

8          Q      Have you ever had your pay taken

9    away?

10         A      No.

11         Q      Has your job status ever changed

12   since December of 2001?

13                      MR. LOCKINGER:  Objection.

14                      You can answer.

15         A      Yes.

16         Q      Has it increased?

17         A      Yes.

18         Q      Have you ever received

19   performance evaluations?

20         A      Yes.

21         Q      When is the last time you

22   received a performance evaluation?

23         A      I think they are either quarterly

24   or monthly.  I'm not sure.

25         Q      Have you gotten them on a regular

52

                          Lichtenstein

1

2    basis?

3           A      I believe so.

4           Q      Do you get a certain overall, how

5    do they rate your performance?

6                          MR. LOCKINGER:  Objection.

7                          You can answer, if you

8                          can.

9           A      I don't know.  I'm not sure.

10          Q      Did you review them?

11          A      No, I've always gotten good

12   recommendations, so I've never really reviewed

13   my performance status.

14          Q      So you've never read the written

15   performance -- did you get written performance

16   evaluations?

17          A      Yes.

18          Q      And you chose not to read them?

19          A      Yes.

20          Q      Where are they now?

21          A      I believe they are on file at the

22   medical division.

23          Q      Is that a file that you control?

24          A      No.

25          Q      So when you are provided with a

53

                    Lichtenstein

1
2    copy of your evaluation, what have you done with

3    it?

4          A      I don't think I have ever kept

5    it.

6          Q      You just throw them away?

7          A      I think so.

8          Q      Are you under the influence of

9    alcohol?

10         A      No.

11         Q      Have you had anything to drink in

12   the last eight hours, alcohol?

13         A      No.

14         Q      Are you taking any medications?

15         A      No.

16         Q      Have you been prescribed any

17   medications that you have chosen not to take?

18         A      No.

19         Q      Can you think of any reason why

20   you can't give your best and truthful answers

21   here today?

22         A      No.

23         Q      Did anyone tell you to provide

24   dishonest answers here today?

25         A      No.

54

1                          Lichtenstein

2          Q       What, if anything, did you do to

3     prepare for today's deposition?

4          A       I met with the city corporation

5     counsel attorney.

6          Q       Who is that?

7          A       This gentleman to my left

8     (indicating).

9          Q       Do you know his name?

10          A       I'm sorry, no.

11                    MR. HARMAN:  So let the

12                    record reflect that the witness

13                    has gestured to Mr. Lockinger,

14                    who is the attorney of record for

15                    the department in this action.

16          Q       When did you meet with the city

17     attorney?

18          A       I believe we met, I believe we

19     met sometime last week.  It could have been last

20     Wednesday or Thursday.

21          Q       Where did that meeting take

22     place?

23          A       At the city corp counsel

24     headquarters.

25          Q       And was that in a private office?

55

```
1                        Lichtenstein
2           A       Yes.
3           Q       Was anyone else present?
4           A       Yes.
5           Q       Who else was present?
6           A       There was a representative from
7    the NYPD legal bureau.
8           Q       An attorney?
9           A       Yes.
10          Q       What's that person's name?
11          A       I don't have her name, but it's a
12   matter of record.
13          Q       Had you met with her before?
14          A       In other matters.
15          Q       Not in this matter?
16          A       No.
17          Q       Was anyone else present?
18          A       I don't believe so.
19          Q       And how long did that meeting
20   take place?
21          A       Three or four hours.
22          Q       And did you look at any documents
23   during that meeting?
24          A       No, I don't think I did.
25          Q       Did you take any notes?
```

56

1                    Lichtenstein

2         A       No.

3         Q       Did you listen to any recordings?

4         A       No.

5         Q       Did you watch any videos?

6         A       No.

7         Q       Did you call anyone on the phone?

8         A       No.

9         Q       And other than this three or

10   four-hour meeting with the city attorney and the

11   representative from the Police Department, did

12   you do anything else to prepare for your

13   deposition?

14        A       No.

15        Q       Do you maintain a file on Mr.

16   Umanzor?

17        A       I do not.

18        Q       Does the Police Department have a

19   file on Mr. Umanzor?

20                 MR. LOCKINGER:  Objection.

21                 You can answer, if you

22            can.

23        A       Yes, I believe they do.

24        Q       When was the last time you

25   reviewed that file?

57

1                          Lichtenstein

2          A       I don't know.

3          Q       Well, were you given a copy of

4     the subpoena summoning you to appear today for

5     your testimony?

6          A       I don't believe so.

7          Q       When did you first learn that you

8     were being deposed?

9          A       I don't remember.

10          Q       How did you learn?

11          A       I was notified at first by the

12     chief surgeon's office, and then I was in

13     contact with a member of the legal bureau from

14     the department that I was going to have a

15     meeting with city corp counsel attorneys.

16          Q       And that was the meeting that

17     took place you think last Wednesday?

18          A       Yes.

19          Q       And you didn't meet with the city

20     attorney before last Wednesday?

21                          MR. LOCKINGER:  Objection

22                  to form.

23                          You can answer.

24          A       No.

25          Q       Did you speak with him on the

MCM REPORTING SERVICE
(516) 775-5209

58

1                     Lichtenstein

2   phone?

3                     MR. LOCKINGER:  Objection.

4                     You can answer.

5        A       Since that conversation, yes.

6        Q       Since the Wednesday conversation?

7        A       Yes.

8        Q       When you first learned, after you

9   learned that you were going to be meeting with

10  the city attorney providing testimony, did you

11  review Mr. Umanzor's file?

12                    MR. LOCKINGER:  Objection.

13                    You can answer.

14       A       I believe I did.

15       Q       When was that?

16       A       I don't remember.

17       Q       Was it in the last couple of

18  months?

19       A       Probably.

20       Q       So tell me what you did to review

21  the file.

22       A       I looked at his medical records

23  and reviewed his MRI report and his physician's

24  assessment.

25       Q       Where is the file located?

59

1                        Lichtenstein

2                   MR. LOCKINGER:   Objection.

3                   You can answer.

4         A       I believe it's at the medical

5    division.

6         Q       Where is that?

7         A       Lefrak Plaza.

8         Q       What floor?

9         A       Sixteenth floor.

10        Q       Can you describe where you

11   located the file?

12        A       I believe the file was brought to

13   me on my request to my office.

14        Q       Who did you ask for the file?

15        A       One of the civilian employees.

16        Q       Do you remember that person's

17   name?

18        A       No.

19        Q       Who would you normally go to to

20   retrieve a file?

21        A       I would request it from one of

22   the secretaries.

23        Q       Who are the secretaries?

24        A       I'm not good with names.

25        Q       How many secretaries are there

60

1                           Lichtenstein

2     that support you?

3                         MR. LOCKINGER:  Objection.

4                         You can answer.

5              A      Five.

6              Q      You don't know any of their

7     names?

8              A      No.  I think one of them is named

9     Dawn, but I don't know any of their last names.

10             Q      Is Dawn the one that retrieved

11    Mr. Umanzor's file?

12             A      Probably.

13             Q      Is she someone you go to more

14    frequently than others?

15             A      She's the one I deal with most

16    often.

17             Q      How old is Dawn?

18             A      Thirty-five, thirty-six.

19             Q      And Dawn or someone brought you

20    the file?

21             A      Yes.

22             Q      And what did you do then?  You

23    said you looked at the MRI and doctor's

24    assessment.

25                         After you did that, what did you

61

1                     Lichtenstein

2    do?

3         A     I don't understand the question.

4         Q     Did you return the file?

5         A     Yes.

6         Q     Did you give it back to Dawn or

7    someone else?

8         A     Yes.

9         Q     Did you make a copy of it?

10        A     No.

11        Q     Did you take any notes?

12        A     No.

13        Q     Did you take pictures of it?

14        A     No.

15        Q     And you believe that you did that

16   after you were alerted that you were going to be

17   meeting with the city attorney?

18                    MR. LOCKINGER:  Objection.

19                    You can answer.

20        A     Yes.

21        Q     Do you use e-mail for work?

22        A     No.

23        Q     Not at all?

24        A     No.

25        Q     Do you have any social media

62

1                          Lichtenstein

2     accounts?

3              A      Facebook.

4              Q      What's your Facebook name?

5              A      I think it's David Lichtenstein.

6              Q      How about LinkedIn?

7              A      No.

8              Q      Any other social media accounts?

9              A      Instagram.

10             Q      You do have Instagram.

11                    And what's your Instagram account

12    name?

13             A      I think it's the same thing.

14             Q      How frequently do you post on

15    Facebook?

16             A      Maybe two or three times a week.

17             Q      And how about Instagram?

18             A      Maybe every three or four months.

19             Q      Do you take pictures and post

20    them?

21             A      Yes.

22             Q      What types of things do you take

23    pictures of?

24             A      My granddaughter.

25             Q      So family and friends.

63

1                          Lichtenstein

2          A       Yes.

3          Q       Do you ever post anything on

4     Instagram that is related to your medical

5     practice?

6          A       No.

7                          MR. LOCKINGER:  Objection.

8                          You can answer.

9          Q       How about your job as the deputy

10    chief at the department?

11         A       No.

12         Q       How about on Facebook, do you

13    ever post anything related to your medical

14    practice?

15         A       No.

16         Q       Ever post anything related to

17    your role at the department?

18         A       No -- I'll say no.

19         Q       Who is the chief surgeon of the

20    department?

21         A       Dr. Kleinman.

22         Q       And what type of relationship

23    professionally do you have with Dr. Kleinman?

24         A       He's my superior.

25         Q       And how long has he been your

64

1                        Lichtenstein

2    superior?

3           A       Ten years, maybe 15 years.

4           Q       Is the chief's position a

5    full-time role?

6           A       Yes.

7           Q       And have you ever discussed Mr.

8    Umanzor with Dr. Kleinman?

9                        MR. LOCKINGER:  Objection.

10                        You can answer.

11          A       I did apprise him that I was

12   going to be giving a deposition today.

13          Q       And what, if anything, did he say

14   in response?

15          A       Nothing.

16          Q       So other than to alert him that

17   you were going to be engaged in this activity,

18   did you discuss Mr. Umanzor in any other way

19   with Dr. Kleinman?

20          A       Not specifically, no.

21          Q       Generally?

22          A       It generally encompasses his

23   medical issue, not specifically this candidate

24   in question.

25          Q       Tell me what medical issue, tell

65

                              Lichtenstein

1

2     me what you discussed related to his medical

3     issue.

4                         MR. LOCKINGER:  Objection.

5                         You can answer.

6          A      Our evaluation for certain

7     medical disorders is transitional and we have

8     talks from time to time about the changing

9     attitudes that we have in terms of qualification

10    and disqualification.

11         Q      On how many occasions have you

12    discussed the transitional nature, I take it we

13    are talking about MS?

14         A      No, a host of disorders, but MS

15    is one of them.

16         Q      Other than MS, what are the other

17    disorders that are transitional medical issues

18    where attitudes are changing?

19         A      Seizure disorder and hearing.

20         Q      How many times in the last year

21    have you discussed the transitional nature of MS

22    and the changing attitudes?

23                         MR. LOCKINGER:  Objection.

24                         You can answer.

25         A      At least five or six times.

66

1                        Lichtenstein

2          Q       Tell me about the first one.

3          A       I know we have had discussions

4     regarding the one or two persons with MS that we

5     qualified within the last year or two.

6          Q       After appeal?

7                        MR. LOCKINGER:  Objection.

8                        You can answer.

9          A       I don't think that they were

10    appealed.

11                       I think they were on review.  I

12    don't think it ever went to an appeal.

13                       In other words, if someone puts

14    down that they have multiple sclerosis, then

15    that would generate a review.

16                       I believe in those two cases, at

17    least definitely in one case, the review found

18    that the candidate was qualified and it did not

19    go to an appeal.

20                       I think I believe that both cases

21    did not go to an appeal, but I'm not 100 percent

22    sure.

23         Q       Well, I asked you about those

24    cases and you said you believed that you had

25    offered testimony, correct?

67

1                     Lichtenstein

2                 MR. LOCKINGER:  Objection.

3                 You can answer.

4        A      I don't believe I said that.

5        Q      Perhaps I asked you that in the

6     context of referrals to neurologists and so I

7     apologize.

8                 Let's go back to your discussion

9     with Dr. Kleinman.

10                 You testified that you discussed

11    these two instances where candidates, and you

12    don't recall whether it was a candidate for the

13    department or a candidate for the program,

14    correct?

15        A      Correct.

16        Q      Where those individuals were

17    placed under review because they indicated that

18    they had been diagnosed with MS, correct?

19        A      Yes.

20        Q      And if anyone indicates that they

21    have been diagnosed with MS, they are

22    automatically placed under review?

23                 MR. LOCKINGER:  Objection.

24                 You can answer.

25        A      Yes.

68

1                        Lichtenstein

2           Q       Was Mr. Umanzor placed under

3     review?

4           A       Yes.

5           Q       And what did you say to Dr.

6     Kleinman about those two individuals that were

7     placed under review because of their MS?

8           A       Well, our general discussion is

9     always the same, that we have to try to adhere

10    to the spirit of the Americans With Disabilities

11    Act.

12                  Can the candidate do the job

13    today?  And what supporting data do we have that

14    would suggest or give us doubt in that regard.

15          Q       That was the nature of the

16    conversation?

17          A       Those are the nature of

18    conversations in all of these cases.

19          Q       And so tell me with respect to

20    those two individuals what Dr. Kleinman said.

21          A       He thought that based on the

22    private medical records of those individuals and

23    the recommendation of the department

24    neurologist, my recommendation, that those two

25    candidates could be qualified.

69

1                          Lichtenstein

2          Q      Did you go to Dr. Kleinman for

3     final approval?

4                     MR. HARMAN:  Objection.

5                     You can answer.

6          A      No, it was more of a for your

7     information.

8          Q      So you were seeking his advice?

9          A      Yes.

10         Q      So informal approval?

11                    MR. LOCKINGER:  Objection.

12         A      Yes -- well --

13         Q      But he doesn't have to sign off

14    on what you do?

15         A      No.

16         Q      And he supported your

17    determination in those two instances?

18         A      Yes.

19         Q      Did you discuss Mr. Umanzor with

20    him?

21         A      Yes.

22         Q      What did you say to him?

23         A      I told him that this candidate

24    appeared to have intact neurological status with

25    no real deficiencies, but my concern was that

70

1                          Lichtenstein

2      the time of his diagnosis to the time he was

3      applying for his position was too short.

4              Q      Did you say anything else?

5              A      No.

6              Q      And what did he say in response?

7              A      He reminded me that every case

8      has to be individually assessed and that was it.

9                      MR. HARMAN:  Can you read

10                     back the answer?

11                     (Whereupon, the record was

12                     read back by the reporter.)

13             Q      What was the time period?

14                     MR. LOCKINGER:  Objection.

15             A      As I recall, it was less than a

16     year.

17             Q      And what would have been a

18     satisfactory time period for you?

19                     MR. LOCKINGER:  Objection.

20                     You can answer, if you

21                     can.

22             A      Actually in this case, because he

23     was going from cadet to police officer, I

24     probably would have been happy with two years,

25     because then it would have been another two

71

1                          Lichtenstein
2      years of his college before, four years would
3      have gone by before he actually came up for his
4      new physical exam for his police officer status.
5           Q      So as I understand that there are
6      different criteria for determining whether
7      someone can be a cadet as opposed to whether
8      someone can be a police officer?
9                          MR. LOCKINGER:  Objection.
10                         You can answer, if you
11                    can.
12          A      Technically, yes, in a real
13     sense, no.
14                    We are entering into a contract
15     with them that they are going to become police
16     officers.
17                    Technically, at the time that we
18     enter into that contract, they're not going to
19     the academy, they're not expected to make
20     arrests, they're not given a firearm.
21          Q      But you have testified that you
22     applied different standards to assessing whether
23     someone was qualified to be a cadet?
24                         MR. LOCKINGER:  Objection.
25          A      That's not exactly correct.

72

Lichtenstein

1

2      Q      Well, you said that because he

3  was applying to be a cadet, you would have been

4  happy with two years, because by the time he

5  applied to be a police officer, the period would

6  be longer than two years, correct?

7      A      Correct.

8      Q      More in the range of that three

9  to five that you testified earlier that you

10 found acceptable?

11     A      Correct.

12     Q      And you have testified that as a

13 cadet you don't make arrests?

14                  MR. LOCKINGER:  Objection.

15     A      Correct.

16     Q      And you don't go to the academy?

17     A      I don't know.  I don't believe

18 they enter into formal academy training.

19     Q      But you're not sure?

20     A      They may have some academics that

21 they -- I'm not exactly sure.

22     Q      You have testified that cadets

23 don't make arrests, correct?

24     A      Correct.

25     Q      Do cadets have to control civil

73

```
 1                    Lichtenstein
 2   disorder?
 3                    MR. LOCKINGER:  Objection.
 4                    You can answer.
 5        A      As far as I know, the answer is
 6   no.
 7        Q      Do cadets have to collect and
 8   preserve evidence?
 9        A      No.
10        Q      Do cadets have to assess a crime
11   scene?
12        A      No.
13        Q      Do cadets have to operate
14   vehicles?
15                    MR. LOCKINGER:  Objection.
16                    You can answer.
17        A      I don't know.
18        Q      Do cadets have to arrest DWI
19   suspects?
20                    MR. LOCKINGER:  Objection.
21                    You can answer.
22        A      They do not.
23        Q      Do cadets have to participate in
24   disaster control?
25                    MR. LOCKINGER:  Objection.
```

74

1                          Lichtenstein

2          A       I don't know.

3          Q       Do cadets have to provide

4    emergency medical assistance as part of their

5    job duties?

6                          MR. LOCKINGER:  Objection.

7          A       I don't know.

8          Q       Do cadets have to interview and

9    interrogate suspects?

10                         MR. LOCKINGER:  Objection.

11         A       They do not.

12         Q       Do cadets have to engage in motor

13   vehicle accident prevention?

14                         MR. LOCKINGER:  Objection.

15         A       I believe not.

16         Q       Are cadets placed on patrol?

17                         MR. LOCKINGER:  Objection.

18         A       I believe not.

19         Q       Do cadets have to search for and

20   seize evidence?

21                         MR. LOCKINGER:  Objection.

22         A       They do not.

23         Q       Do cadets have to use deadly

24   force?

25                         MR. LOCKINGER:  Objection.

75

1                        Lichtenstein

2        A      They do not.

3        Q      Do cadets have to respond and

4    investigate crimes?

5                        MR. LOCKINGER:  Objection.

6        A      They do not.

7                        MR. HARMAN:  We have been

8                        going about an hour.  Let's take

9                        a five-minute break.

10                       (Whereupon, at 12:19 p.m., a

11                       recess was taken.)

12                       (Whereupon, at 12:30 p.m.,

13                       the deposition resumed with all

14                       parties present.)

15                       MR. HARMAN:  Back on the

16                       record.

17   BY MR. HARMAN:

18       Q      You testified earlier that you

19   placed two individuals who were candidates under

20   review who had identified themselves as having

21   been diagnosed with MS; is that correct?

22       A      Yes.

23       Q      Do you recall whether those were

24   candidates for the department or the program?

25       A      I believe --

76

1                     Lichtenstein

2                     MR. LOCKINGER:  Objection.

3                     You can answer.

4          A     I believe they were for the

5     department.

6          Q     And you also testified that you

7     placed Mr. Umanzor's file under review as well;

8     is that correct?

9          A     Yes.

10         Q     In the last five years, how many

11    files have you placed under review because the

12    candidates identified themselves as having been

13    diagnosed with MS?

14                    MR. LOCKINGER:  Objection.

15                    You can answer, if you

16               can.

17         A     It will be a guess.  It will be

18    an estimate.

19                    I would say ten.

20         Q     And we talked about three of them

21    and we will talk a lot more about Mr. Umanzor.

22                    Of the ten, we know Mr. Umanzor

23    was a candidate for the cadet program, he was an

24    applicant for the cadet program, correct?

25         A     Yes.

77

1                          Lichtenstein

2          Q       Were any of the ten applicants to

3    the cadet program?

4          A       I don't think so.  I think they

5    were all police officer candidates.

6          Q       So other than Mr. Umanzor, can

7    you think of any instances in which you just

8    disqualified someone from the cadet program

9    because of MS?

10         A       No.

11         Q       And going back to your

12   conversation with Dr. Kleinman, you testified

13   that you believed that Mr. Umanzor had not been

14   asymptomatic for a long enough period of time;

15   is that correct?

16                         MR. LOCKINGER:  Objection.

17                         You can answer.

18         A       In my opinion.

19         Q       Did he offer an opinion?

20         A       No.

21         Q       By the way, as you sit here

22   today, do you stand by your determination that

23   Mr. Umanzor should have been disqualified from

24   the cadet program?

25                         MR. LOCKINGER:  Objection.

78

```
 1                    Lichtenstein

 2                    You can answer.

 3          A      At the time he presented for his

 4    application?

 5          Q      Yes.

 6          A      Yes.

 7          Q      And what about as you sit here

 8    today?

 9                         MR. LOCKINGER:  Objection.

10                         You can answer.

11          A      I'm sorry?

12          Q      What about as you sit here today?

13          A      In other words, would I consider

14    his application today?

15          Q      As you sit here today has your

16    opinion changed?

17                         MR. LOCKINGER:  Objection.

18                         You can answer.

19          A      If he's been asymptomatic since

20    his application, if he has been tolerating his

21    medication with no problems, I would qualify him

22    today.

23          Q      You would qualify him today?

24                         MR. LOCKINGER:  Objection.

25                         You can answer.
```

79

1                    Lichtenstein

2         A       Probably, based on his medical

3    data.

4         Q       If he had been taking his

5    medication and he was asymptomatic?

6         A       And he has a clearance letter

7    from his neurologist, yes.

8         Q       Well, isn't it true he had a

9    clearance letter from his neurologist?

10        A       Yes and no.

11                He had a clearance letter, but it

12   was not a detailed examination that supported

13   his application.

14        Q       Do you know the name of his

15   neurologist?

16        A       I don't remember.

17        Q       Did you ever contact his

18   neurologist?

19        A       I did not.

20        Q       Did you ask for additional

21   information from his neurologist?

22        A       No.

23        Q       And in the paperwork that you

24   reviewed from his neurologist, did his

25   neurologist indicate that he was medically

MCM REPORTING SERVICE
(516) 775-5209

80

1                          Lichtenstein

2    cleared to be a cadet?

3                     MR. LOCKINGER:  Objection.

4          A     Yes.

5          Q     And then you determined that the

6    submission from the doctor was not detailed

7    enough to support the application?

8          A     No.

9                I -- actually, I did feel that

10   his clearance note was sufficient.

11                    MR. HARMAN:  Can you read

12                    back not the last response, but

13                    the one prior to that?

14                    (Whereupon, the record was

15                    read back by the reporter.)

16         Q     What do you mean by that?

17         A     Just as I stated yes and no, yes,

18   I felt that in this case with his medical

19   documentation that was a sufficient medical

20   clearance letter.

21                No, it wasn't the kind of letter

22   that I usually like to see in terms of

23   overturning this kind of diagnosis.

24                I would have liked to have seen a

25   more detailed examination, but based on his

81

1                        Lichtenstein

2      medical records that were otherwise provided, I

3      thought that the medical letter that was

4      supplied was sufficient enough to have him

5      qualified.

6            Q      But you disqualified him?

7            A      Correct.

8            Q      But the letter on its face was

9      sufficient to qualify him?

10           A      Yes.

11           Q      But you didn't believe it was

12     detailed enough?

13           A      That's not what I -- I know --

14           Q      I'm sorry.  I'm not really trying

15     to argue with you, so you believed it was

16     sufficient to qualify him, but you would have

17     preferred to see something more detailed?

18           A      Yes.

19           Q      But you didn't ask for something

20     more detailed?

21           A      No, because the letter wasn't my

22     issue.

23           Q      What was your issue?

24           A      My only issue with this candidate

25     was the brevity of his medical history with this

82

1                        Lichtenstein

2     diagnosis to his time of application.

3              I felt that the time period was

4     too short.

5              Q      And what was the time period?

6              A      I believed from his diagnosis and

7     treatment to the time of his application was

8     less than a year, eight or nine months, I

9     believe.

10             Q      And is there a policy that the

11    cadet program has with respect to how many

12    months you need to be asymptomatic?

13                        MR. LOCKINGER:  Objection.

14                        Answer if you can.

15             A      There is no set policy that I

16    know of.

17             Q      And how about at the Police

18    Department?  How about at the Police Department?

19                        MR. LOCKINGER:  Objection.

20             Q      Is there a policy that you need

21    to be asymptomatic for any specific period of

22    time?

23             A      No, there is not.

24             Q      Was Mr. Umanzor entitled to

25    appeal your decision?

83

1                    Lichtenstein

2                    MR. LOCKINGER:  Objection.

3                    You can answer, if you

4          can.

5     A     I'm not sure.

6          That's my answer.  I'm not sure.

7     Q     You testified that you determined

8  that eight or nine months, your testimony is

9  that you determined that eight or nine months

10 wasn't a long enough period of time to be

11 asymptomatic, but that was not based on a policy

12 or procedure of the department, correct?

13    A     Yes.

14    Q     And that was not based on a

15 policy or procedure of the cadet program,

16 correct?

17    A     Yes.

18    Q     Was it based on any research that

19 you had conducted?

20                   MR. LOCKINGER:  Objection.

21                   You can answer.

22    A     Once again, I don't want to get

23 into an argument.  I just don't want to

24 misspeak.

25                   Research in terms of reading up

84

1                          Lichtenstein

2      on the medical disorder or research in clinical

3      trials?

4             Q       Any clinical research.

5             A       As far as the literature that I

6      reviewed, I felt that in this case not enough

7      time period had gone by from his diagnosis to

8      his time of application that I could make a

9      reasonable assessment of how he was going to do

10     from the time he signed his contract.

11            Q       And what research did you review?

12                    MR. LOCKINGER:  Objection.

13                    You can answer, if you

14                    can.

15            A       I believe I referenced Harrison's

16     Internal Medicine, and I also, I've also looked

17     at some literature from the American Journal of

18     Radiology in terms of his MRI findings.

19            Q       Anything else?

20            A       I believe I also referenced the

21     Journal of Clinical Neurology in MS trends.

22            Q       Anything else?

23            A       I believe that I also had an

24     informal conversation with the department

25     neurologist, but there were no notes taken at

85

1                         Lichtenstein

2     that time.

3           Q     Anything else?

4           A     Not that I can remember at this

5     time.

6           Q     And is it your testimony that you

7     reviewed these resources to make the

8     determination to disqualify Mr. Umanzor from the

9     cadet program?

10                      MR. LOCKINGER:  Objection.

11                      You can answer.

12          A     Yes.

13          Q     Do you own a copy of Harrison's

14    Internal Medicine?

15          A     Yes.

16          Q     Where is it located?

17          A     It's in my office.

18          Q     Is it a hard copy book?

19          A     Yes.

20          Q     How long have you owned it?

21          A     I just got the new edition about

22    two or three months ago.

23          Q     What edition did you look at to

24    make this determination?

25                      MR. LOCKINGER:  Objection.

86

```
1                      Lichtenstein

2                      You can answer, if you

3           can.

4      A      The 17th or the 18th edition.

5      Q      What, if anything, did you do

6  with the older edition when you got the new one

7  a few months ago?

8      A      I still think I have an older

9  edition at the medical division at Lefrak.

10     Q      So you have two editions?

11     A      Probably three.

12     Q      And do you know which one you

13 looked at?

14     A      I'm pretty sure I looked at my

15 newest edition.

16     Q      The one that you got in the last

17 two months?

18                 MR. LOCKINGER:  Objection.

19     A      Yes.

20                 MR. HARMAN:  I'm going to

21                 call for the production of those

22                 portions of Harrison's Internal

23                 Medicine that you reviewed to

24                 make the determination to

25                 disqualify Mr. Umanzor from the
```

87

1                         Lichtenstein

2                cadet program.

3           Q      What is the American Journal of

4      Radiology?

5           A      It was a -- it was a website that

6      when I was -- I did a web search to see if there

7      were any new trends in MS and overall prediction

8      rates in the short term for his specific type of

9      MS.

10               So I remember doing a Google

11     search and looking at several, at least four or

12     five hits that I got on my Google search.

13          Q      By the way, did you put any of

14     these resources into your, into Mr. Umanzor's

15     file?

16          A      No.

17          Q      Where did you perform this Google

18     search?

19          A      When or where?

20          Q      Where?

21          A      At one of my other jobs.  I try

22     not to use the department computers because they

23     are just horribly slow, so at one of my other

24     employment areas I have to be on line a lot as

25     part of my job and I research those sites on my

88

1                      Lichtenstein

2     computer.

3          Q      How are you compensated?  I'm not

4     asking about your rate of pay, but how are you

5     compensated for your job at the department?

6          A      Salary.

7          Q      You don't get paid by the hour?

8          A      No.

9          Q      Do you get paid extra for

10    appearing at the deposition today?

11         A      No.

12         Q      So you consider this a part of

13    your job responsibilities with the department?

14                      MR. LOCKINGER:  Objection.

15         A      Yes.

16         Q      So the American Journal of

17    Radiology was a website that you went to?

18         A      I know, as I said, I went to

19    several websites.  One of them was a

20    radiological journal, because there were

21    specific mentions of lesions that this gentleman

22    had when he was diagnosed on his MRI, and just

23    looking to see if there were any new findings

24    that should come into my determination of

25    whether or not we could reasonably assess his

89

                        Lichtenstein

1

2    availability for the job.

3         Q      Now, earlier you mentioned Mr.

4    Umanzor's type of MS.

5                What did you mean by that?

6         A      He has the most common type, it's

7    relapsing/remitting.  I believe 85 percent of

8    people with MS have relapsing/remitting.

9         Q      Is that a progressive condition?

10        A      MS by definition is a progressive

11   neurological disorder, but people with

12   relapsing/remitting may do very well and not

13   progress for decades.

14        Q      And do you know what percentage

15   of people with relapsing/remitting MS will do

16   well for decades?

17        A      The last time I checked the CDC

18   website, Center For Disease Control, the

19   majority of people who are diagnosed in their

20   20s will have a partial or full disability

21   within 15 or 20 years.

22        Q      And did that factor into your

23   decision to disqualify Mr. Umanzor from the

24   cadet program?

25                        MR. LOCKINGER:  Objection.

90

1                       Lichtenstein

2                  You can answer.

3           A      If anything, it prejudiced me to

4    hire him.  But the one factor that I found in

5    all my research was that it was impossible to

6    make a diagnosis in the short term of how

7    someone is going to do with their MS, a period

8    of time has to go by.

9                  There is no reliable way, there

10   are no good or bad prognostic indicators that

11   can tell you within a short period of time who

12   is going to be, who is going to do well with

13   their medication and be asymptomatic for a

14   period of years.

15          Q      So the period of time you're

16   referring to is the period of time during which

17   an individual is asymptomatic, correct?

18          A      From their first attack.

19          Q      From their first attack.

20                 And it's your belief that Mr.

21   Umanzor was asymptomatic for eight or nine

22   months, correct?

23                  MR. LOCKINGER:  Objection.

24                  You can answer.

25          A      Yes.

91

                          Lichtenstein

1

2        Q       And did the Harrison's Internal

3   Medicine treatise, is it fair to call it a

4   treatise, let's just call it Harrison's Internal

5   Medicine, did that prescribe an appropriate time

6   period during which someone has not relapsed as

7   an indicator for someone's future with MS?

8        A       There is no specific medical data

9   to prescribe a length of time.

10               The overall thrust of all the

11  medical data is, at this time with multiple

12  sclerosis, the prediction rate has to do with

13  the longitude of the asymptomatic period.

14               So that if people within a short

15  period, within three years, and I say three

16  years, it could be within five years, are on the

17  medication and not having exacerbations of their

18  disease, the statistical chance of them going

19  for long periods with no disabilities is very

20  high.

21               If on the other hand they start

22  having exacerbations within a short period of

23  time, within a three to five-year time period,

24  then some of those persons are reclassified as

25  having progressive relapsing disease, which

92

1                           Lichtenstein

2      occurs in about 25 percent, and those persons

3      have a much poorer prognosis.

4              Q       Is there any indication in Mr.

5      Umanzor's file that he had progressive relapsing

6      disease?

7              A       No.

8              Q       I'm going to ask my question

9      again.

10             Did Harrison's Internal Medicine

11     indicate an amount of years that should pass

12     during which someone was asymptomatic in order

13     to make a prognosis about their long-term future

14     with the disease?

15                           MR. LOCKINGER:  Objection.

16                           You can answer.

17             Q       It either did or did not.

18             A       It did not.

19             Q       How about the American Journal of

20     Radiology, the website that you went to, did it

21     prescribe a number of years that you needed to

22     wait?

23                           MR. LOCKINGER:  Objection.

24             A       The American Journal of Radiology

25     web search was about the lesions and possible

93
```
 1                    Lichtenstein
 2    prognostic factors.
 3          Q     Okay.  But it didn't prescribe a
 4    number of years that you should wait?
 5          A     It did not.
 6          Q     How about the clinical neurology
 7    resource concerning MS trends, did it indicate a
 8    number of years that needed to pass where
 9    someone was asymptomatic?
10          A     No.
11          Q     How about during your
12    conversation with the neurologist, do you recall
13    a specific conversation with the department's
14    neurologist related to Mr. Umanzor?
15          A     No, I do not.
16          Q     As you sit here today, you are
17    not sure whether you went to the neurologist to
18    have a discussion?
19          A     I know we have been having a lot
20    of conversations about MS as an issue, because
21    we are in transition on how we evaluate these
22    patients.
23          Q     I'm just asking, and you have
24    testified to that and I understand, but I'm
25    asking about as part of the review process, you
```

94

1                        Lichtenstein

2     placed Mr. Umanzor's file under review, right?

3            A      Yes.

4            Q      And as part of that process, did

5     you go to the department neurologist and have a

6     discussion about Mr. Umanzor's file?

7            A      I can't recall exactly, so I will

8     say no.

9            Q      What does the review process

10    entail?

11                        MR. LOCKINGER:  Objection.

12                        You can answer.

13           A      Generally speaking, after I've

14    disqualified somebody, they can request a

15    review, and at which point it's their

16    responsibility to submit new medical data and at

17    one point I will review that medical data and if

18    I have found that there is convincing medical

19    evidence, then I will qualify that person, or if

20    I still have questions, then I will either refer

21    it to a department specialist or I'll refer it

22    to the chief surgeon.

23           Q      Did Mr. Umanzor request that his

24    file be reviewed?

25                        MR. LOCKINGER:  Objection.

95

1                       Lichtenstein

2                  You can answer.

3        A       There is a vague quality to his

4    application, because it's not police officer,

5    and I know there is an orderly transition for

6    review with police officer candidates.

7                  I'm not sure about cadets.

8        Q       Are you sure that his file was

9    placed under review?

10                 MR. LOCKINGER:  Objection.

11       A       I don't know.

12       Q       But earlier you testified that it

13   was, on numerous occasions.

14                 So let's make the record clear.

15                 You don't know?

16       A       I don't know.  I don't know.  I

17   misspoke.

18       Q       And you don't have any

19   recollection of discussing Mr. Umanzor's file

20   with the neurologist.

21                 Do you recall discussing Mr.

22   Umanzor's file with the chief surgeon?

23                 MR. LOCKINGER:  Objection.

24                 You can answer.

25       Q       I'm not talking about in general,

MCM REPORTING SERVICE
(516) 775-5209

96

1                           Lichtenstein

2       I'm talking about did you take Mr. Umanzor's

3       file to the chief surgeon and say, "I want to

4       talk about this case"?

5              A      No.

6              Q      And did you seek any new evidence

7       related to the evaluation of Mr. Umanzor's file?

8                     MR. LOCKINGER:  Objection.

9                            You can answer, if you

10                     can.

11             A      I did some medical research on my

12      own to see if there were any new findings in his

13      favor, and I did not.

14             Q      Did you ask him for any

15      additional documentation?

16             A      No.

17             Q      Did you seek any additional

18      documentation from his doctors?

19             A      No.

20             Q      You identified three types of

21      employment.

22                     Can you tell me about the second

23      one.  You've talked extensively about your role

24      at the department.

25                     Can you tell me about the second

97

1                          Lichtenstein

2      category of employment?

3           A       I am a medical instructor and an

4      associate professor in medicine for a few

5      osteopathic medical schools.

6                   I'm not an osteopath, but I am

7      employed as a medical trainer and I have a

8      part-time position at St. John's Hospital in Far

9      Rockaway to teach internal medicine to the

10     osteopathic residents there.

11          Q       What's osteopathology?  I don't

12     know, I'm just asking.

13          A       I have no clue either.

14          Q       And this is an osteopathic

15     program and you are a medical trainer at the

16     program?

17          A       Correct.

18          Q       And what type of training do you

19     provide?

20          A       I run morning report, which is

21     one to two hours where all the cases that were

22     admitted the night before are discussed, and I

23     lecture on each medical case and provide advice

24     on how to proceed with those cases.

25          Q       And is there, so are these cases

98

1                    Lichtenstein

2    that come into the hospital?

3         A      Yes.

4         Q      So it's a teaching hospital?

5         A      Yes.

6         Q      And are you assigned to specific

7    kinds of cases or do you evaluate any case?

8         A      Any case.

9         Q      And are you part of a team that

10   is evaluating individuals, or are you --

11        A      I'm an independent contractor.

12        Q      And what's the third job?

13        A      I am the director of medicine at

14   an HMO in Long Island called Age Well.

15        Q      What does that job entail?

16        A      I oversee medical necessity and I

17   write policy.

18               It's a startup company.  It's

19   been in business for two or three years.

20        Q      Do you have office hours?

21        A      Yes.

22        Q      So there is the Police

23   Department, there is the St. John's teaching

24   hospital and there is Age Well.

25               Do you have a fourth job?

99

1                      Lichtenstein

2           A      I'm in the process of retiring

3    from my medical practice.

4           Q      Are you still seeing patients?

5           A      Yes, but that's going to end in

6    another week or two.

7           Q      Do you have an office?

8           A      Yes.

9           Q      When is the last time you saw a

10   patient?

11          A      A week ago.

12          Q      When do you plan on shutting your

13   office down?

14                      MR. LOCKINGER:  Objection.

15                      You can answer, if you

16                 can.

17          A      Hopefully this Thursday.

18          Q      Why have you decided to retire

19   from your medical practice?

20                      MR. LOCKINGER:  Objection.

21                      Answer if you can.

22          A      It's financially very difficult

23   to run a medical practice today, especially as a

24   solo practitioner.

25          Q      And you are a solo practitioner?

MCM REPORTING SERVICE
(516) 775-5209

100

1                              Lichtenstein

2          A       Yes.

3          Q       Is there any other reason other

4     than economics why you decided to retire at this

5     time from your medical practice?

6                         MR. LOCKINGER:  Objection.

7                         You can answer.

8          A       Purely economics.

9          Q       You are in good standing with the

10    medical licensing authority?

11         A       Yes.

12         Q       Have you ever been disciplined

13    with respect to your medical license?

14                        MR. LOCKINGER:  Objection.

15                        You can answer.

16         A       No.

17         Q       I'm handing you what has been

18    marked as Plaintiff's Exhibit 1.

19                        Please take a look at it

20    (handing).

21         A       (Perusing document.)  Okay.

22         Q       Do you recognize this?

23         A       No.

24         Q       Is that your name?

25         A       Yes.

101

1                            Lichtenstein

2                    MR. HARMAN:  And for the

3               record, this is a one-page

4               document.  It's a printout from a

5               website.

6          Q     Is this your work address, 12105

7    Rockaway Beach Boulevard, is that one of your

8    work addresses?

9          A     That was an old office address

10   from I believe ten years ago.

11         Q     And drawing your attention down

12   to this text that begins, "He runs a horrible

13   practice."

14               Have you ever read that before?

15         A     No.

16         Q     And you are not familiar with

17   this website?

18         A     No.

19         Q     And I'm handing you what has been

20   marked as Plaintiff's Exhibit 2.

21               Please take a look at it

22   (handing).

23         A     (Perusing document.)  Okay.

24         Q     Do you recognize this?

25         A     No.

102

1                           Lichtenstein

2            Q       Is that your name?

3            A       Yes.

4            Q       Is that your picture?

5            A       No.

6            Q       That's not you?

7            A       That's not me.

8            Q       Drawing your attention down to

9    where it says, "Dr. Lichtenstein's experience,"

10   do you recognize any of those as being those

11   that you are experienced in -- withdrawn.

12                   Have you ever officed at 431

13   Beach 129th Street?

14           A       That's my current office address.

15           Q       That's your current office

16   address, but this is not a picture of you?

17           A       Correct.

18           Q       Do you recognize this person?

19           A       No.

20           Q       Did you ever make the statement,

21   "I care about philosophy"?

22           A       I can't answer that question.

23                   MR. LOCKINGER:  Objection.

24           Q       Is your specialty internal

25   medicine?

MCM REPORTING SERVICE
(516) 775-5209

103

1                          Lichtenstein

2          A       Yes.

3          Q       Do you treat abdominal pain?

4          A       Yes.

5          Q       Anemia?

6          A       Yes.

7          Q       I'm handing you what has been

8    marked as Plaintiff's Exhibit 3 (handing).

9                  Please take a look at it.

10         A       (Perusing document.)  Isn't it

11   the same thing?

12         Q       It's not, actually.  Take a

13   moment to look at it and I have some quick

14   questions about it.

15         A       (Perusing document.)

16         Q       If you take a look at Page 1,

17   beginning with procedures, and then move on to

18   conditions on the second page, and I'll have a

19   couple of questions.

20         A       (Perusing document.)  Okay.

21         Q       First of all, do you recognize

22   this as, this document, not the actual document,

23   but do you know what this was printed from?

24                  MR. LOCKINGER:  Objection.

25                  You can answer, if you

104

1                      Lichtenstein

2              can.

3        A      No.

4        Q      And drawing your attention down

5   to the section that begins "Procedures."

6              Have you had an opportunity to

7   review those procedures?

8        A      Just now.

9        Q      And are those procedures that you

10   perform?

11       A      No.

12       Q      So this is not accurate?

13       A      Correct.

14       Q      And how about the second page

15   where it says, "Conditions," do you see that

16   there?

17       A      (Perusing document.)  Yes.

18       Q      Are those conditions you treat?

19                   MR. LOCKINGER:  Objection.

20                   You can answer.

21       A      I can answer your question.

22       Q      Sure.  I'm just asking if you

23   treat these conditions?

24       A      I believe because there is a

25   gastroenterologist across the hallway that they

105

1                          Lichtenstein

2     have mixed up our two practices, because these

3     are all, all of these diagnoses, they are all

4     associated with things that a gastroenterologist

5     would treat.

6                Q     So this is not accurate?

7                A     Correct.

8                Q     Did you go to, did you go to the

9     City University of New York?

10               A     No.

11               Q     Did you go to Harvard?

12               A     No.

13               Q     So it's clearly not accurate.

14                     I'm handing you what has been

15    marked as Plaintiff's Exhibit 4 (handing).

16                     Please take a look at it.

17               A     (Perusing document.)  Okay.

18               Q     Do you recognize this document?

19               A     Yes.

20               Q     What is it?

21               A     I mean, I don't recognize it.

22    I'm looking at it.

23               Q     Do you know what Health Grove is?

24               A     No.

25               Q     Is that your name?

106

1                    Lichtenstein

2          A      Yes.

3          Q      And you office at 431 Beach 129th

4    Street?

5          A      That's my address.

6          Q      And is your phone number

7    (718)318-3434?

8          A      Yes.

9          Q      And have you had 31 years of

10   experience in the medical profession?

11         A      Yes.

12         Q      And is your primary specialty

13   internal medicine?

14         A      Yes.

15         Q      And did you go to Icahn School of

16   Medicine?

17                Where did you go to medical

18   school?

19         A      I initially started medical

20   school in Mexico and I transferred to Mount

21   Sinai for my last two years.

22         Q      Where in Mexico?

23         A      Tampico.

24         Q      Why did you leave the school in

25   Mexico and come to the United States?

107

1                        Lichtenstein

2                    MR. LOCKINGER:  Objection.

3                    You can answer, if you

4            can.

5        A       Because I did like way better on

6    my test scores.

7        Q       Is that why you went to, started

8    medical school in Mexico because of your test

9    scores?

10       A       Yes.

11       Q       Did you get into medical school

12   in the United States?

13       A       Yes.

14       Q       Why didn't you attend that

15   medical school?

16       A       No, I mean I got in --

17       Q       Before you went to medical school

18   in Mexico, did you get into a medical school in

19   the United States?

20       A       No.

21       Q       There's some data over there.  It

22   says, "Dr. Lichtenstein billed Medicare a total

23   of $391,000."

24                    Do you see that there on the

25   second page?

108

1                      Lichtenstein

2          A      (Perusing document.)  Yes.

3          Q      Does that data appear to be

4    accurate?

5                      MR. LOCKINGER:  Objection.

6                      Answer if you can.

7          A      I don't know.

8          Q      I asked you earlier about whether

9    Mr. Umanzor was entitled to appeal your decision

10   and you said you didn't know.

11                     Do you really not know whether he

12   is entitled to appeal your decision?

13                     MR. LOCKINGER:  Objection.

14         A      I believe he is.  I don't know

15   for certain.

16         Q      What leads you to believe, what

17   prevents you from being certain?

18                     MR. LOCKINGER:  Objection.

19         A      I'm more knowledgeable about the

20   appeals process with police officers.

21                     I really haven't disqualified

22   that many cadets to know exactly what the

23   appeals process is.

24         Q      Are you confident that a

25   candidate or an applicant to the department

109

1                          Lichtenstein

2     would have the opportunity to appeal an adverse

3     decision that you made disqualifying them from

4     being a police officer?

5                     MR. LOCKINGER:  Objection.

6                     You can answer.

7          A     Yes.

8          Q     And is that written down in

9     policies and procedures somewhere?

10                    MR. LOCKINGER:  Objection.

11                    You can answer, if you

12              can.

13         A     I believe so.

14         Q     And are there separate policies

15    and procedures for the cadet program?

16                    MR. LOCKINGER:  Objection.

17                    You can answer, if you

18              can.

19         A     That's why I say I don't know.  I

20    don't know.

21              I assume it's the same, but it

22    could be different.

23         Q     And you testified earlier that

24    you were the ultimate authority on the decision

25    to disqualify someone from the cadet program,

110

1                        Lichtenstein

2    correct?

3                        MR. LOCKINGER:  Objection.

4                        You can answer.

5         A      Yes.

6         Q      I'm handing you what has been

7    marked as Plaintiff's Exhibit 5 (handing).

8                        Please take a look at it.

9         A      (Perusing document.)  Okay.

10        Q      Do you recognize this document?

11        A      No.

12        Q      But that's your address?

13        A      Yes.

14        Q      And the affiliation is accurate,

15   St. John's?

16        A      Well, they left out Lenox Hill

17   Hospital.

18        Q      So you're affiliated with Lenox

19   Hill and St. John's?

20        A      Yes.

21        Q      Are you affiliated with any other

22   hospital?

23        A      Not any longer.

24        Q      I'm handing you what has been

25   marked as Plaintiff's Exhibit 6 (handing).

111

1                        Lichtenstein

2                  Please take a look at it.

3        A        (Perusing document.)  Okay.

4        Q        Do you recognize this document?

5        A        I don't think I have actually

6   seen this document.

7        Q        Okay.

8                  Have you ever read a complaint in

9   a lawsuit before?

10                      MR. LOCKINGER:  Objection.

11       A        Yes.

12       Q        So you know what they look like?

13       A        Yes.

14       Q        Did you read the complaint in the

15  matters that you were a defendant in, the

16  malpractice claims?

17                      MR. LOCKINGER:  Objection.

18                      Answer if you can.

19       A        Yes.

20       Q        But you didn't read this

21  complaint?

22       A        I don't believe I have seen this

23  document (indicating).

24       Q        I'm handing you what has been

25  marked as Plaintiff's 7 (handing).

112

1                      Lichtenstein

2                      Please take a look at it.

3          A      (Perusing document.)  Okay.

4          Q      Do you recognize this document?

5          A      Yes.

6          Q      What is it?

7          A      It's one of the malpractice cases

8    that I referenced before.

9          Q      And in the caption at the top of

10   the page where it says, "David Lichtenstein,

11   M.D., and David Lichtenstein, Physician, PC," is

12   that you and your entity?

13         A      Yes.

14         Q      And are you the sole owner of

15   David Lichtenstein Physician, PC?

16         A      Yes.

17         Q      And is that still an active

18   corporation in the State of New York?

19         A      Yes.

20         Q      And right there at the bottom it

21   says, "David Lichtenstein, MD, defendant, pro

22   se."

23                Did you eventually obtain

24   attorneys in this case?

25         A      Yes.

113

1                        Lichtenstein

2           Q       Do you know who your attorneys

3    were for this matter?

4           A       They were assigned by the

5    malpractice company.

6           Q       And that's the same malpractice

7    carrier that you referred to earlier?

8           A       In this case, yes.

9           Q       I'm handing you what has been

10   marked as Plaintiff's Exhibit 8 (handing).

11                  Please take a look at it.

12          A       (Perusing document.)

13          Q       Do you recognize this document?

14                       MR. LOCKINGER:  Objection.

15                       Answer if you can.

16          A       I don't recall this document.

17          Q       Do you know who Sanford

18   Lindenbaum is?

19                       MR. LOCKINGER:  Objection.

20                       Answer if you can.

21          A       No.

22          Q       Turn your attention, if your

23   will, to the second to the last page.

24          A       (Perusing document.)  Okay.

25          Q       Do you see where it says, "Yours

114

1                      Lichtenstein

2    et cetera"?

3              A     Yes.

4              Q     And do you see a name below that

5    in bold, I mean in all caps?

6              A     Yes.

7              Q     Do you recognize any of those

8    names?

9              A     (Perusing document.)  It appears

10   that one of them was my attorney for this

11   action.

12             Q     Who was your attorney for this

13   action?

14             A     It says Sanford R. Lindenbaum.

15             Q     And do you have any reason to

16   believe that he was not your attorney for this

17   action?

18             A     I assume he was.

19             Q     Other than being your attorney

20   for this action, do you have any other

21   relationship with Mr. Lindenbaum?

22             A     No.

23             Q     And he was chosen by your

24   malpractice carrier?

25             A     Yes.

115

```
1                        Lichtenstein
2          Q        I'm handing you Plaintiff's
3    Exhibit 9 (handing).
4                   Please take a look at it.
5          A        (Perusing document.)  Okay.
6          Q        Do you recognize this document?
7                        MR. LOCKINGER:  Objection.
8                        Answer if you can.
9          A        No.
10         Q        Drawing your attention down to
11   Paragraph 3, No. 3, could you please read that
12   paragraph?  You don't have to read it out loud.
13   Just read it to yourself.
14         A        Okay.
15         Q        It goes on to the next page.
16         A        (Perusing document.)
17         Q        Taking a step back, tell me when
18   you're ready.
19         A        I'm ready.
20         Q        The plaintiffs in this case are
21   Robert London and Ann London.
22                   Is that you as the defendant?
23         A        Yes.
24         Q        And is that your entity?
25         A        Yes.
```

116

1                          Lichtenstein

2          Q      And having read Paragraph 3 in

3    this document entitled "Verified Bill Of

4    Particulars," do you have any reason to believe

5    that does not describe the claims that were

6    brought against you in the London matter?

7                          MR. LOCKINGER:  Objection.

8                          You can answer.

9          A      No.

10         Q      I'm handing you Plaintiff's

11   Exhibit 10 (handing).

12                      Please take a look at it.

13         A      (Perusing document.)  Okay.

14         Q      This also involves the London

15   matter, but it's an amended document.

16                      Do you know why the bill of

17   particulars was amended in this case?

18                          MR. LOCKINGER:  Objection.

19                          You can answer.

20         A      I don't remember.

21         Q      If you'd just take the time to

22   read Paragraph 3 again.

23         A      (Perusing document.)  Okay.

24         Q      Do you have any reason to believe

25   that this still doesn't accurately reflect the

117

1                          Lichtenstein

2    claims that were brought against you by the

3    London plaintiffs?

4                          MR. LOCKINGER:  Objection.

5                          You can answer.

6          A      This reflects accurately the

7    claims.

8          Q      And drawing your attention to the

9    second page, seven lines down, would you agree

10   that one of the allegations that the Londons

11   made against you was you failed to properly take

12   and/or document the patient's history.

13                 Would you agree with that?

14         A      Yes.

15         Q      And that you failed to take heed

16   of and appreciate the significance of the

17   patient's history?

18         A      Yes.

19         Q      Would you agree that that's what

20   it says?

21         A      Yes.

22         Q      And a few more lines down, would

23   you also agree that it says that you failed to

24   take heed of and appreciate the significance of

25   the patient's signs and symptoms or signs,

118

                                Lichtenstein

1

2   symptoms?

3                       MR. LOCKINGER:  Objection.

4        A      Yes.

5        Q      And having read the rest of this

6   paragraph, do you see anything in here that you

7   don't recognize as the claims that were brought

8   against you by the Londons?

9                       MR. LOCKINGER:  Objection.

10                      You can answer, if you

11                  can.

12       A      No, it appears accurate.

13       Q      And was the London matter

14   resolved?

15       A      It was settled.

16       Q      And did you make a cash payment

17   as part of the settlement?

18       A      Yes.

19       Q      And were you, did anyone else

20   contribute to the pool of money that was paid as

21   part of the London matter?

22                      MR. LOCKINGER:  Objection.

23                      Answer if you can.

24       A      No.

25       Q      You were the only person that

119

1                        Lichtenstein

2    paid.

3                        The insurance carrier didn't

4    contribute any money to the settlement?

5         A       No, they paid the settlement.

6         Q       They paid the settlement.

7                        I'm handing you what has been

8    marked as Plaintiff's Exhibit 11 (handing).

9                        Please take a look at it.

10        A       (Perusing document.)  Okay.

11        Q       Do you recognize this document?

12        A       Yes.

13        Q       What is it?

14        A       It is a relatively new guideline

15   from New York State for the assessment of the

16   fitness standards for peace officers.

17        Q       Does this document apply to

18   cadets?

19                        MR. LOCKINGER:  Objection.

20                        You can answer, if you

21                   can.

22        A       Yes.  Well, that's not true.

23                   No, it does not.

24        Q       It doesn't?

25        A       It does not.

120

1                         Lichtenstein

2          Q       And what is the basis of your

3   testimony?

4                         MR. LOCKINGER:  Objection.

5                         You can answer, if you

6                  can.

7          A       When we hire cadets, we're only

8   entering into a contract that we're -- with a

9   cadet, they're going to provide a service for us

10  and we are going to give them a financial

11  benefit of some sort, and at some point they

12  agree to become police officers.

13         Q       So it's your testimony that these

14  are standards that are applied to people who are

15  actually applying to become police officers as

16  opposed to people who are applying to become

17  cadets?

18                        MR. LOCKINGER:  Objection.

19         A       Technically, that's correct.

20         Q       And you testified that this

21  document that is entitled, "Medical and Physical

22  Fitness Standards and Procedures For Police

23  Officer Candidate," is a relatively new

24  document?

25         A       Yes.

121

1                          Lichtenstein

2           Q       What does that mean?

3           A       That means that there are certain

4    areas of the document that are relatively new,

5    especially in the neurological section, there is

6    a guideline that if someone with seizure

7    disorders is asymptomatic for one year, that

8    they should be considered for employment.

9                   The older evaluations were two to

10   three years.

11          Q       And I draw your attention down to

12   the second page.

13          A       (Perusing document.)

14          Q       Do you see there where it says at

15   the very bottom, it says, "Version 2011?"  No,

16   the second page, the first page is the title

17   page.

18                  That page right there.

19                  So you see there it says,

20   "Version 2011, 9/14/2011"?

21          A       Yes.

22          Q       Is it still your testimony that

23   this document has been updated recently?

24          A       I'll testify that this document,

25   that I have not reviewed this document.

122

1                      Lichtenstein

2                      The first time that I have seen

3     this document was about three years ago.

4           Q      When was the last time you saw

5     it?

6           A      Well, it's up on my bulletin

7     board in my office.

8           Q      Okay.

9                  But when was the last time you

10    looked at it?

11                      MR. HARMAN:  I'm going to

12                  call for the production of the

13                  version that is on the witness'

14                  bulletin board in his office.

15          A      The last time I looked at it was

16    last week.

17          Q      So you regularly go to the one

18    that's on the bulletin board in your office?

19          A      Yes.

20          Q      And do you know what the date is

21    on that version?

22          A      I've never checked.

23          Q      When is the last time, when do

24    you recall getting that version, three years

25    ago?

123

1                        Lichtenstein

2          A       Yes, roughly three years ago.

3                  I can clear this up if you would

4     like me to.

5          Q       Sure.

6          A       We have our own title

7     requirements with recommendations for job

8     evaluations that are purely generated by the

9     department.  These are generated by the state.

10                 And up until recently, and I say

11    "recently," within three to five years, we

12    pretty much went by our own guidelines.

13                 Recently we have been directed to

14    go by New York State.  So even though this

15    document may be an older document, I didn't

16    review it until the last three years.

17         Q       And this document says that if

18    you have been asymptomatic for a year, that you

19    should be qualified?

20         A       You should be considered for

21    qualification for a seizure disorder, which was

22    a new thing to me.

23                 I thought, you know, that it was

24    at least two or three years.

25         Q       And does it say anything about

124

1                          Lichtenstein

2     MS?

3            A      MS is listed as one of the

4     progressive neurological diseases that should be

5     considered for disqualification, but there is,

6     there is a qualifying remark that all disorders

7     need to be individually assessed.

8            Q      And is there a time period by

9     which an individual who has been diagnosed with

10    MS should be asymptomatic before they can be

11    qualified under these standards?

12           A      No, it's left pretty vague.

13           Q      It's left vague.

14                  But you have been directed to

15    follow these standards?

16                          MR. LOCKINGER:  Objection.

17                          Answer if you can.

18           A      No, we have not been directed to

19    follow the standards.  But in terms of --

20           Q      Why then do you review the

21    standards?

22                          MR. LOCKINGER:  Objection.

23                          You can answer, if you

24                  can.

25           A      As I said before, and I'll say

125

1                          Lichtenstein

2     now, our evaluation for chronic medical

3     disorders is going through a transition period,

4     and there's very few cohesive source documents

5     for police officer eligibility with medical

6     disorders.

7                    In other words, there has been no

8     specific medical studies done in each one of

9     these medical issues.  Most of them have been

10    decided by court cases.

11                   So for -- so years ago if you

12    were a type one diabetic, you would be

13    disqualified, but because of court cases and the

14    fact that there is no good medical evidence to

15    show that type one diabetes will prevent someone

16    from doing the job today, that we have

17    reassessed those persons and now it is no longer

18    an automatic disqualification.

19                   And it's the same thing with MS.

20         Q      Have you ever been disciplined at

21    the police department?

22                   MR. LOCKINGER:  Objection.

23         A      No.

24         Q      Have you ever received any

25    negative feedback for qualifying someone who was

126

1                            Lichtenstein

2     later determined to be, to have, to be suffering

3     an event in their life that would otherwise

4     disqualify them?

5                       MR. LOCKINGER:  Objection.

6          Q     And if you don't understand my

7     question, I'm happy to rephrase it.  It was a

8     complicated question.

9          A     I understand and I'll answer it.

10         Q     Okay.

11         A     There have been times where I

12    will review a borderline orthopedic issue and

13    that candidate was either a member of the armed

14    forces or they are in another police department

15    and I would qualify those persons and then

16    within a short period of time that underlying

17    orthopedic disorder had come up and caused them

18    to become disabled.

19                     So I'm not disciplined on those

20    things, but it is an area for self review.

21         Q     And how about with respect to

22    neurological conditions, has that ever come up

23    where it has been brought to your attention that

24    someone became disabled within a relatively

25    short amount of time after you qualified them?

127

                              Lichtenstein

1

2          A       To my knowledge, no.

3          Q       Were there any signs in Mr.

4    Umanzor's file that he could become disabled in

5    the near future?

6          A       As I've already stated, and the

7    reason for my disqualification for this

8    candidate was that I did not feel comfortable

9    with the short period of time between his

10   diagnosis and his application.

11         Q       I'm just asking if there was

12   anything in his file that indicated that he was

13   on the verge of becoming disabled?

14                      MR. LOCKINGER:  Objection.

15                      You can answer.

16         A       Yes and no.

17         Q       Well, what was in his file that

18   indicated to you that he was on the verge of

19   becoming disabled?

20                      MR. LOCKINGER:  Objection.

21                      You can answer, if you

22                 can.

23         A       His MRI report listed that he had

24   a large parietal lesion and that he also had

25   secondary uptake in his cervical spine.

128

1                           Lichtenstein

2                    And there is an old, old, which

3      has been disproved, notion of something called

4      plaque load initially with MS persons, that the

5      higher your plaque load, the more likely you are

6      to not do well with the disease.

7                    But there are some, and that was

8      the radiological journal that I had reviewed,

9      that a soft, poor clinical indicator is uptake

10     in the cervical spine, but that was a minor part

11     of my decision making.

12          Q     You have mentioned some of the

13     data that was in his medical file.

14          A     Yes.

15          Q     But my question to you was what

16     in his medical file led you to believe that he

17     was on the verge of becoming disabled?

18                    So is there anything specific in

19     his file, you said yes and no, and I asked you

20     what was the yes part and I'm still not clear

21     because you just told me what was in his file.

22                    Why don't you tell me what

23     indicated to you with specificity that he was on

24     the verge of becoming disabled?

25                         MR. LOCKINGER:  Objection.

129

1                    Lichtenstein

2                    You can answer.

3          A      The yes part was that not enough

4    time period had gone by since his initial

5    diagnosis.

6          Q      And that indicated to you that he

7    was on the verge of becoming disabled?

8          A      Yes.

9          Q      And the medical and physical

10   fitness standards, did you go to them as part of

11   your evaluation of Mr. Umanzor's file?

12                    MR. LOCKINGER:  Objection.

13                    You can answer.

14         A      Not in this case.

15         Q      You have testified that you don't

16   use e-mail as part of your work

17   responsibilities.

18                    Do you take notes?

19         A      If I write any note, it's on the

20   candidate's application form.

21         Q      Do you generate memoranda?

22                    MR. LOCKINGER:  Objection.

23                    You can answer.

24         A      No, no, there is a formal --

25   there's a formal document that needs to be

130

1                         Lichtenstein

2     generated.

3                    There is no memoranda.

4          Q     So other than taking notes in a

5     file --

6          A     In the applicant's file.

7          Q     In the applicant's file, do you

8     do any other kinds of writing?

9                    MR. LOCKINGER:  Objection.

10                   You can answer.

11         A     I will write an opinion for

12    certain -- for -- to answer certain medical

13    answers that arise within the department, but

14    not as it applies to candidates.

15         Q     When is the last time you wrote

16    an opinion?

17                   MR. LOCKINGER:  Objection.

18                   You can answer.

19         A     The last time was right after

20    9/11, there was a question about the incidence

21    of sarcoid and I was asked to see if there was

22    an abnormal rise in sarcoid in New York City

23    post 9/11 exposure in the Police Department

24    versus the civilian population.

25         Q     Have you ever written an opinion

131

1                     Lichtenstein

2    on MS?

3         A      No.

4         Q      Have you ever written an opinion

5    on neurological disorders?

6         A      No.

7         Q      And how long have you been in

8    private practice?

9         A      You read it.

10        Q      Thirty-one years?

11        A      Thirty-one years.

12        Q      During your time in private

13   practice, have you ever diagnosed anyone with

14   MS?

15                    MR. LOCKINGER:  Objection.

16                    You can answer.

17        A      Unfortunately, yes.

18        Q      How many times?

19        A      Many times.

20        Q      Before you reach a decision to

21   make a final diagnosis in your private practice,

22   do you make a referral to another doctor?

23        A      Generally, no.

24        Q      So you don't refer patients to a

25   neurologist?

132

1                        Lichtenstein

2            A       I refer them for treatment.

3            Q       But you diagnose before you

4      refer?

5            A       Correct.

6            Q       And how many times in the last

7      year have you diagnosed someone with MS?

8            A       In the last year?

9            Q       Yes.

10           A       I would say three people in the

11     last five years.

12                   It's not a very common diagnosis.

13           Q       Three people in the last five

14     years?

15           A       Yes.

16           Q       And did you send them for second

17     opinions?

18           A       I sent them for treatment.

19           Q       Who did you send, to whom did you

20     send them for treatment?

21           A       There are area neurologists and

22     there's an MS specialist at NYU that I use.

23     What's his name?  I don't remember.

24                   I send the tougher cases to him.

25                   The problem with MS, and there is

133

1                         Lichtenstein

2    no definitive diagnostic test for MS.  MRIs are

3    helpful, lumbar spine fluid analysis is helpful,

4    but the technical diagnosis for MS is

5    fluctuating neurological changes through time.

6                    There is no exact medical test.

7                    So a lot of times you have to

8    infer MS, and that can lead in a delay of

9    diagnosis.

10           Q     Do you believe it's -- have you

11   ever prescribed someone medication for MS?

12           A     I don't believe that's

13   appropriate.

14                    I do treat acute exacerbations of

15   MS with IV steroids in the hospital.

16           Q     But I'm talking about in your

17   private practice?

18           A     No.

19           Q     So you believe it's in the

20   patient's best interest to refer them to a

21   specialist for treatment?

22           A     Yes.

23           Q     And you don't prescribe medicine?

24           A     Only on an emergency basis, and

25   that's only for an acute flareup of MS.

134

1                          Lichtenstein

2          Q      And is that because a specialist

3     is more qualified to assess the patient's needs?

4                          MR. LOCKINGER:  Objection.

5                          You can answer, if you

6                   can.

7          A      That's part of it.

8                   The other part of it is, most,

9     MS drug therapy is very expensive, and most

10    medical insurances wouldn't consider paying for

11    it unless it was being referred by a specialist.

12         Q      I'm handing you what has been

13    marked as Plaintiff's 12 (handing).

14                   Please take a look at it.

15         A      (Perusing document.)  Okay.

16         Q      Do you recognize this?

17         A      I recognize the second page.

18         Q      What about the second page do you

19    recognize?

20         A      That was the medical clearance

21    letter from the candidate's doctor.

22         Q      And you would agree that it

23    clears Mr. Umanzor for service as an NYPD cadet?

24                          MR. LOCKINGER:  Objection.

25                          You can answer.

135

1                      Lichtenstein

2           A      For the most part, yes.

3                  I was slightly concerned about,

4    there was a reference to some residual

5    neurological changes in, you know, a mild

6    sensory loss in the fingers of the hand, but

7    when I had gone through his physical exam, that

8    was not mentioned, so I didn't know if that was

9    an error or whether it was just not significant

10   in his medical issues.

11          Q      But did you ever ask for any

12   additional information?

13          A      No.  I compared the letter to his

14   physical exam that the doctor sent and I was

15   satisfied that this letter qualified, but was

16   qualified.

17          Q      You relied on the physical exam?

18          A      Yes.

19          Q      And the physical exam didn't

20   indicate any mild sensory loss?

21          A      Correct.

22          Q      I'm handing you what has been

23   marked as Plaintiff's Exhibit 13 (handing).

24                 Please take a look at it.

25          A      (Perusing document.)  Okay.

136

1                        Lichtenstein

2          Q       Do you recognize this --

3                  MR. HARMAN:  For the

4                  record, this is a series of

5                  documents Bates stamped D00019

6                  through D00021.

7          Q       Do you recognize this series of

8     documents?

9          A       I remember looking at them.

10         Q       So did you review these documents

11    to make your determination related to Mr.

12    Umanzor's disqualification from the cadet

13    program?

14                 MR. LOCKINGER:  Objection.

15                 You can answer.

16         A       Yes.

17         Q       I'm handing you what has been

18    marked as Plaintiff's Exhibit 14 (handing).

19                 Please take a look at it.

20         A       (Perusing document.)  Okay.

21         Q       Was Mr. Umanzor taking

22    medication?

23         A       Yes.

24         Q       And do you know what medication

25    he was taking?

137

1                           Lichtenstein

2           A      He was taking one of the

3     immunomodulators, he was taking Tecfidera on

4     7/24/13 and he was having some slight reaction

5     to it, but that didn't concern me.

6           Q      To what extent does medication

7     prevent relapse?

8           A      The newer immunomodulators have

9     been found to be very effective, which is why we

10    are altering our evaluation of MS patients.

11                 In the past the medications were

12    not that effective.

13                 Nowadays with his type of

14    relapsing/remitting and no symptoms over a

15    period of time, he should do very well and be

16    asymptomatic for decades.

17          Q      I'm handing you what has been

18    marked as Plaintiff's Exhibit 15 (handing).

19                 Please take a look at it.

20          A      (Perusing document.)  Okay.

21                      MR. HARMAN:  For the

22                      record, this is D000026 through

23                      27.

24          Q      Do you recognize these documents?

25          A      Yes.

138

1                        Lichtenstein

2          Q      Were they part of the collection

3    of documents that you reviewed related to your

4    disqualification of Mr. Umanzor?

5                        MR. LOCKINGER:  Objection.

6                        You can answer.

7          A      Yes.

8                        MR. HARMAN:  I don't think

9                        I have any more questions, but if

10                       we could just take about five

11                       minutes, but I think we're just

12                       about done.

13                       I am, however,

14                       technically, going to leave your

15                       deposition open.  We have made a

16                       variety of different requests on

17                       the record and we'll follow up in

18                       a writing with more detailed

19                       requests, but you can take that

20                       up with your lawyer.

21                       Give me five minutes,

22                       please?

23                       MR. LOCKINGER:  Yes.

24                       I have a couple on

25                       redirect.

139

1                     Lichtenstein

2              Just literally two.

3              MR. HARMAN:  Let me

4        confirm that I'm done and then

5        you can do redirect.

6              MR. LOCKINGER:  Sure.

7              (Whereupon, at 1:41 p.m., a

8        recess was taken.)

9              (Whereupon, at 1:50 p.m.,

10        the deposition resumed with all

11        parties present.)

12              MR. HARMAN:  I have a few

13        more followup questions and I

14        will give you your opportunity to

15        ask questions.

16   BY MR. HARMAN:

17        Q    Do you know when Mr. Umanzor was

18   diagnosed with MS?

19        A    I would have to refer back to his

20   record.

21              I remember when I reviewed it the

22   time period of his diagnosis and treatment and

23   his application period was less than a year.

24        Q    It was?

25        A    I believe so, yes.

MCM REPORTING SERVICE
(516) 775-5209

140

1                        Lichtenstein

2          Q       The difference between --

3          A       From when he got his last

4    treatment, because at first he was treated with

5    IV steroids, I think, for his acute issue, I

6    know he had two attacks and one of them he was

7    treated acutely and appropriately with IV

8    steroids.

9                   And then as it became stable, he

10   was put on maintenance therapy.  And, once

11   again, I would have to reference the file

12   itself, but from the time he was, I would say

13   from the time he was placed on his maintenance

14   therapy to his application period was less than

15   one year.

16         Q       Do you know if he was diagnosed

17   before or after the attacks?

18         A       I assume with his age and his

19   presentation that they would make the diagnosis

20   right away, but I can't say.

21         Q       So you believe it was sometime

22   after the attacks?

23         A       I believe he had his attack, and

24   because of his symptoms he was, they made an

25   immediate diagnosis, I would assume.

141

```
1                        Lichtenstein
2                I never really checked.
3         Q      And you were basing your
4    determination to disqualify him based on the
5    period between his last attack and his
6    application?
7                        MR. LOCKINGER:  Objection.
8                        You can answer.
9         A      Yes.  Yes.
10        Q      I'm going to hand you, again,
11   Plaintiff's Exhibit 12 and ask you to turn to
12   the second page (handing).
13        A      (Perusing document.)  Okay.
14        Q      Do you see where it says --
15   what's the date of this letter?
16        A      It's dated April 15, 2014.
17        Q      And then what does the first
18   sentence say?
19        A      "To whom it may concern:
20               "Mr. Umanzor is a patient under
21   my care for relapsing/remitting multiple
22   sclerosis diagnosed in February 2013."
23        Q      So you would agree with me that
24   his attacks were sometime before February 2013?
25                        MR. LOCKINGER:  Objection.
```

142

1                          Lichtenstein

2              A       Yes.

3              Q       And you would agree with me that

4      you received this letter sometime after April

5      15, 2014?

6              A       Okay.

7              Q       Yes or no?

8              A       I don't know.

9              Q       You don't know when you received

10     it?

11                     Any reason to believe that you

12     received it before April 15, 2014?

13             A       I don't remember.

14             Q       I'm asking you if you have any

15     reason to believe that you received -- that this

16     letter is misdated, that you somehow received it

17     before April of 2014?

18             A       I don't believe so.

19             Q       Okay.

20                         MR. HARMAN:  No further

21                     questions.

22     EXAMINATION

23     BY MR. LOCKINGER:

24             Q       Earlier today you discussed Randy

25     Umanzor being placed on medical review and then

143

1                        Lichtenstein

2    later you talked about there being a decision to

3    disqualify him and a subsequent medical review.

4                    Is there -- is medical review a

5    term of art within the appeal process or within

6    the process of an application for a candidate

7    for a police officer position?

8         A    I'm sorry, is it a what?

9         Q    You originally placed Randy

10   Umanzor on medical review, correct?

11        A    Yes.

12        Q    And then subsequently you made a

13   decision to disqualify him, correct?

14        A    Yes.

15        Q    And after you made the decision

16   to disqualify him, was there something else

17   available to him that was not medical review?

18        A    Yes, I believe, I believe he

19   had -- there was an appeal process.

20        Q    So appeal and medical review are

21   two distinct things?

22        A    Correct.

23        Q    You just stated --

24                    MR. LOCKINGER:  Actually,

25                    no further questions.

                    MCM REPORTING SERVICE
                       (516) 775-5209

144

1                    Lichtenstein

2              MR. HARMAN:  I don't

3         either.

4              Thank you.

5              (Whereupon, at 1:55 p.m.,

6         the deposition was concluded.)

7

8                    _____

9                    DAVID LICHTENSTEIN

10

11   Subscribed and sworn to

12   before me

13   this ▮▮ day of ▮▮, 2015.

14   _____
          NOTARY PUBLIC

15

16

17

18

19

20

21

22

23

24

25

145

I N D E X   P A G E

Witness                 Examination By           Page

David Lichtenstein  Mr. Harman               4

                    Mr. Lockinger          142


                    EXHIBITS

Plaintiff's
Exhibits                Description            Page

   1        One-page document                  4

   2        A three-page document              4

   3        A four-page document               4

   4        Health Grove document              4

   5        A three-page document              4

   6        Complaint                          4

   7        Summons                            4

   8        Answer                             5

MCM REPORTING SERVICE
(516) 775-5209

146

EXHIBITS

Plaintiff's
Exhibits                    Description                  Page

   9        Verified Bill of Particulars                  5

  10        Amended Verified Bill of                       5
            Particulars

  11        Medical and Physical Fitness                   5
            Standards and Procedures for
            Police Officer Candidate

  12        A document Bates stamped                       5
            D000017 through D000018

  13        A document Bates stamped                       5
            D000019 through D000021

  14        A document Bates stamped                       6
            D000022 through D000024

  15        A document Bates stamped                       6
            D000026 through D000027

147

1

2                    C E R T I F I C A T E

3     STATE OF NEW YORK  )

4                       ) ss.

5     COUNTY OF NEW YORK )

6                I, MARGARET M. HARRIS, a Shorthand

7          (Stenotype) Reporter and Notary Public of

8          the State of New York, do hereby certify

9          that the foregoing Deposition, of the

10         witness, DAVID LICHTENSTEIN, taken at the

11         time and place aforesaid, is a true and

12         correct transcription of my shorthand

13         notes.

14              I further certify that I am neither

15         counsel for nor related to any party to

16         said action, nor in any wise interested in

17         the result or outcome thereof.

18              IN WITNESS WHEREOF, I have hereunto

19         set my hand this 28th day of July, 2015.

20

21              _____

22                   MARGARET M. HARRIS

23

24

25

                    MCM REPORTING SERVICE
                       (516) 775-5209