**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------X
RANDY UMANZOR,

                 *Plaintiff*,

     -against-

NEW YORK POLICE DEPARTMENT,           **14 CV 9850 (VSB)**

                 *Defendant*.
-----------------------------------------------------------X
_____

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION OF DEFENDANT'S**
**MOTION FOR SUMMARY JUDGMENT**
_____

**THE HARMAN FIRM, LLP**
Walker G. Harman, Jr.
Edgar M. Rivera
220 Fifth Avenue, Suite 900
New York, New York 10001
wharman@theharmanfirm.com
erivera@theharmanfirm.com

*Attorneys for Plaintiff*

## TABLE OF AUTHORITIES

CASES                                                                                    PAGES

*Adickes v. S. H. Kress & Co.*, 398 U.S. 144 (1970)..................................................2, 3

*Altman v. New Rochelle Pub. Sch. Dist.,* No. 13-CV-3253 (NSR), 2014 WL 2809134 (S.D.N.Y. June 19, 2014)............................................................................................14

*Am. Fed. Grp., Ltd. v. Rothenberg,* 136 F.3d 897 (2d Cir.1998)..................................23

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986)..................................................3

*Bayport-Blue Point School Dist. v. State Div. of Human Rights*, 131 A.D.2d 849 (Sup. Ct. 2nd Dep't 1987).........................................................................................6

*Bragdon v. Abbott,* 524 U.S. 624 (1998).........................................................15, 16, 17

*Cameron v. Coach Apparel Store,* No. 07 Civ. 3991(BSJ), 2009 WL 536068 (S.D.N.Y. Mar. 3, 2009)..........................................................................................24

*Carroll v. Bayerische Landesbank*, 150 F. Supp. 2d 531 (S.D.N.Y. 2001)...................22

*D'Amico v. City of New York*, 132 F.3d 145 (2d Cir. 1998)..................................18,  20

*Dipol v. N.Y.C. Transit Auth.*, 999 F. Supp. 309 (E.D.N.Y. 1998)...............................17

*Dolan v. N.Y. State Dep't of Civ. Serv.*, 304 A.D.2d 1037 (App. Div. 3d Dep't 2003)..................8

*EEOC v. Burlington Northern & Santa Fe Ry.,* 621 F. Supp. 2d 587 (W.D. Tenn. 2009)............17

*EEOC v. Hussey Copper Ltd.*, 22 A.D. Cases (BNA) 1821 (W.D. Pa. Mar. 10, 2010)....13, 17, 18

*Fraterrigo v. Akal Sec., Inc.*, 2008 WL 4787548 (Oct. 29, 2008).................................18

*Flood v. County of Suffolk*, 820 F. Supp. 709 (E.D.N.Y. 1993).....................................9

*Flores v. Buy Buy Baby, Inc.*, 118 F. Supp. 2d 425 (S.D.N.Y. 2000)...........................22

*Greene v. Coach, Inc.*, 218 F. Supp. 2d 404 (S.D.N.Y. 2002)..................................14, 22

*Harrington v. City of New York*, 2013 NY Slip Op 31327(U), 2013 WL 3227781 (N.Y. Sup. Ct. N.Y. Co. 2013)..................................................................................8, 23

*Hayes v. Estee Lauder Companies, Inc.*, 34 A.D.3d 735 (App. Div. 2d Dep't 2006)....................3

*Kanhoye v. Altana, Inc.*, 686 F. Supp. 2d 199 (E.D.N.Y. 2009)...............................21, 22

*Keith v. County of Oakland*, 703 F.3d 918 (6th Cir. 2013)...........................................................16

*Makinen v. City of New York*, 53 F. Supp. 3d 676 (S.D.N.Y. 2014)..................................14-15, 16

*Matter of State Div. of Human Rights on Complaint of Granelle*, 70 N.Y.2d 100 (1987)..........5, 6

*McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973)...........................................................3

*MBIA Ins. Corp. v. Patriarch Partners VIII, LLC,* 842 F.Supp.2d 682 (S.D.N.Y.2012).............23

*McKennon v. Nashville Banner Publishing Company*, 513 U.S. 352 (1995).........................14, 21

*Morales v. New York City Police Dept.,* No. 97 Civ. 7151(MGC), 1999 WL 169533 (S.D.N.Y. Mar. 25, 1999)...........................................................................................................................24

*Mugavero v. Arms Acres, Inc.*, 680 F. Supp. 2d 544 (S.D.N.Y. 2010)........................................22

*Padilla v. Metro-N. Commuter R.R.*, No. 88 CIV. 8659 (LMM), 1995 WL 431324 (S.D.N.Y. July 21, 1995), *aff'd,* 92 F.3d 117 (2d Cir. 1996)..............................................................22

*Quinby v. WestLB AG,* No. 04–CV–7406, 2007 WL 1153994 (S.D.N.Y. Apr. 19, 2007)............23

*Shah v. Wilco Sys., Inc.*, 27 A.D.3d 169 (2005)...........................................................................3

*Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161 (2d Cir. 2006)...........................................................3

*Smith v. Ortiz,* 136 Misc. 2d 110 (N.Y. Sup. Ct. N.Y. Co. 1987)..............................................8-9

*Urciuoli v. Department of Citywide Admin. Servs.*, 75 A.D.3d 427 (App. Div. 1st Dep't 2010)....8

*United States v. Diebold, Inc.*, 369 U.S. 654 (1962)....................................................................2

*Walsh v. Kelly*, 79 A.D.3d 552 (App. Div. 1st Dep't 2010)...........................................................8

*Warmsley v. MTA N.Y City Transit Auth.*, 308 F. Supp. 2d 114 (E.D.N.Y. 2003).........................4

<u>STATUTES</u>                                                                                                                      <u>PAGES</u>
Americans with Disabilities Act, 42 U.S.C. §§ 12101–12213...................................1, 3, 4, 14, 15

New York Civil Service Law § 50(4)(f).........................................................................................7

New York City Human Rights Law, §§ 8-107 et seq. ....................................................................1

Restoration Act § 1, New York City, N.Y., Loc. Laws No. 85.......................................................5

RULES                                                                        PAGES
Fed. R. Civ. P. 8(c)..................................................................................4

Fed. R. Civ. P. 12(b)...............................................................................25

REGULATIONS                                                          PAGES
29 C.F.R. § 1630.2(m)...........................................................................4

29 C.F.R. § 1630.2(r)........................................................................15, 17

N.Y. Comp. Codes R. & Regs. tit 9, § 466.11(g)(2)(ii)...........................15

LEGISLATIVE HISTORY                                               PAGES
136 CONG. REC. S7422-03, 7437 (daily ed. June 6, 1990) (statement of Sen. Harkin)...................1

INTERPRETIVE GUIDANCE                                            PAGES
29 C.F.R. § 1630, App.............................................................................15

# TABLE OF CONTENTS

PRELIMINARY STATEMENT                                                                  1

STATEMENT OF FACTS                                                                     2

STANDARD OF REVIEW                                                                     2

LEGAL ARGUMENT                                                                         4
    I.   **Defendant Cannot Show that Plaintiff Was Not "Otherwise Qualified."** ..................................4

       A. Plaintiff has provided substantial evidence that he was "otherwise qualified."                4

       B. Plaintiff's "failure" to disclose information in the medical review stage was not deceptive or intentional.                                                                              7

       C. Any "failure" to disclose only goes to damages, not liability.                             13

    II.   **Defendant's "Direct Threat" Defense Fails.**.................................................................14

       A. Defendant did not conduct an individualized assessment so cannot avail itself to the "direct threat" defense.                                                                         15

       B. The "Direct Threat" Defense applies only to currently existing danger, not that which might occur in the future.                                                                      17

       C. There is a dispute of fact as to whether Plaintiff posed a high probability of substantial harm to himself or others.                                                              19

    III.   **Defendant's After-Acquired Evidence Defense Fails.**...........................................................21

    IV.   **Plaintiff Withdraws His Request for Punitive Damages Against Defendant.**.....................24

    V.   **It Is Against Equity To Dismiss Plaintiff's Claims Due To the NYPD Being a Non-Suable Entity.** ..............................................................................................................................24

CONCLUSION                                                                             25

## PRELIMINARY STATEMENT

Plaintiff Randy Umanzor ("Plaintiff" or "Mr. Umanzor") respectfully submits this Memorandum of Law in opposition to Defendant's Motion for Summary Judgment.  Defendant the New York Police Department ("Defendant" or the "NYPD") refused to hire Mr. Umanzor for the NYPD's Cadet Program (the "Cadet Corps")—which provides a fast track to the Police Academy and a career in the NYPD—based on the belief that Mr. Umanzor would become disabled at some point in the future due to his multiple sclerosis ("MS") diagnosis.  Mr. Umanzor was asymptomatic for all relevant purposes at the time of his application and continues to be to the present.  Defendant's conduct violates the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12101–12213, and the New York City Human Rights Law ("NYCHRL"), N.Y. ADMIN. CODE §§ 8-101 to 8-131.

The ADA was designed, in part, to combat stereotypical assumptions adversely affecting individuals with disabilities.  *See* 42 U.S.C. §  12101(a)(1-8).  "The thesis of the [ADA] is simply this:  That people with disabilities ought to be judged on the basis of their abilities; they should not be judged nor discriminated against based on unfounded fear, prejudice, ignorance, or mythologies; people ought to be judged based upon the relevant medical evidence and the abilities they have."  136 CONG. REC. S7422-03, 7437 (daily ed. June 6, 1990) (statement of Sen. Harkin).  To that end, the ADA prohibits employers from discriminating against "a qualified individual with a disability because of the disability of such individual in regard to job application procedures, the hiring, advancement, or discharge of employees, employee compensation, job training, and other terms, conditions, and privileges of employment."  42 U.S.C. §  12112(a).

1

Defendant's Motion asks this Court to re-write the ADA.  Instead of focusing the inquiry on whether an individual could perform the essential functions of the job, Defendant requests that this Court allow employers to disqualify applicants based on the mere possibility that they may become unable to perform in the future.  The instant motion asks the Court to ignore the central thesis of the ADA: "that people ought to be judged on the basis of their abilities and not on unfounded fear, prejudice, ignorance or mythologies."  As such, this Court should deny Defendant's Motion for Summary Judgment.

## STATEMENT OF FACTS

For a full statement of the facts, Plaintiff respectfully refers the Court to Plaintiff's Counter Statement of Facts Under Local Civil Rule 56.1 ("Plaintiff's Counter Statement"), dated April 29, 2016 ("Pl. 56.1 Stmt."); the Declaration of Walker G. Harman, Jr. ("Harman Decl."), dated April 29, 2016; the Declaration of Kristen Babinski, M.D. ("Babinski Decl."), dated April 29, 2016; the Declaration of Randy Umanzor ("Umanzor Decl."), dated April 29, 2016; and the supporting evidence cited to in Plaintiff's 56.1 Statement; and the exhibits annexed to the Declarations of Harman, Babinski, and Umanzor.

## STANDARD OF REVIEW

As the moving party, Defendant has the burden of showing the absence of a genuine issue as to any material fact and, for these purposes, the evidence must be viewed in the light most favorable to the Plaintiff.  *Adickes v. S. H. Kress & Co.*, 398 U.S. 144, 157 (1970); *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [the moving party's] materials must be viewed in the light most favorable to the party opposing the motion").  At the summary judgment stage the Court's

function is not to weigh the evidence or determine the truth of the matter but to assess whether

there is a genuine issue for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

Where the evidence cited in support of the motion fails to establish a genuine issue of material

fact, summary judgment must be denied, even if no opposing evidence is presented. *Adickes*,

398 U.S. at 160.

ADA[1] employment discrimination claims are subject to the burden-shifting analysis

established by the Supreme Court in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

*Sista v. CDC Ixis N. Am., Inc.*, 445 F.3d 161, 169 (2d Cir. 2006).   Under *McDonnell Douglas*, a

plaintiff must first establish a *prima facie* case; then, the employer must proffer a legitimate non-

discriminatory reason for the discharge. *Id.*   If the employer proffers such a reason, the plaintiff

must produce evidence showing that the proffered reason is a pretext. *Id.*   A plaintiff establishes

a *prima facie* case of disability discrimination by showing the following: "(1) his employer is

subject to the ADA; (2) he was disabled within the meaning of the ADA; (3) he was otherwise

qualified to perform the essential functions of his job, with or without reasonable

accommodation; and (4) he suffered adverse employment action because of his disability." *Sista*,

445 F.3d at 169.   A plaintiff is considered disabled within the meaning of the ADA if he was

regarded as having a substantially limiting impairment, whether the individual has such an

impairment or not.   42 U.S.C § 12102(1)(c).

---

[1] For the purposes of this Motion, the NYCHRL follows the same burden shifting as the *McDonnell Douglas* analysis. *Shah v. Wilco Sys., Inc.*, 27 A.D.3d 169, 176 (2005) ("It is well settled that in determining employment discrimination claims under the New York City Human Rights Law, federal standards are applied... "). Additionally, federal precedent interpreting the ADA provides strong guidance in interpreting analogous provisions of New York State Human Rights Law.   *Hayes v. Estee Lauder Companies, Inc.*, 34 A.D.3d 735, 737 (App. Div. 2d Dep't 2006).

## LEGAL ARGUMENT

It is undisputed that the NYPD is an employer subject to the ADA, that Mr. Umanzor was "regarded as" disabled under the ADA, and that his disqualification for employment was an adverse employment action.  As such, the only remaining liability issue is whether Mr. Umanzor was "otherwise qualified" or was a "direct threat" to himself and others.[2]  As shown below, the Court should deny Defendant's Motion because Defendant cannot show that Mr. Umanzor was unqualified for the Cadet position.

### I.     Defendant Cannot Show that Plaintiff Was Not "Otherwise Qualified."

Under the ADA, a "qualified individual with a disability" is defined as "an individual with a disability who, with or without reasonable accommodation, can perform the essential functions of the employment position that such individual holds or desires." 42 U.S.C. § 12111(8).  To determine whether an individual can perform the essential functions of the position a court may examine whether the individual has the requisite skill, experience, education and other job-related requirements of the position sought.  29 C.F.R. § 1630.2(m).

### A.     Plaintiff has provided substantial evidence that he was "otherwise qualified."

Plaintiff has provided ample evidence that he was otherwise qualified to perform the essential job functions of a Cadet and Police Officer.  That Defendant suggests otherwise illustrates a dispute of material fact, rendering this matter unsuitable for summary judgment.

First, Mr. Umanzor has demonstrated that he was and is physically capable of performing police work.  Mr. Umanzor has been physically active both before and after his application to the Cadet Corps, playing basketball, running, weight training, holding jobs that require strenuous

---

[2] Defendants also move to strike Plaintiff's claim for front pay and to receive back pay, to strike punitive damages, and to dismiss the Complaint due to the NYPD being a non-suable entity.

physical activity, and easily passing multiple federal and state fitness tests for employment in positions similar to the Cadet Program.  Umanzor Decl. ¶¶ 31-32, 62-77.

Second, Mr. Umanzor possessed all the academic qualifications necessary for the Cadet program: after four years preparing for a career as a police officer, he graduated from John Jay College of Criminal Justice in May 2015 with a degree in Criminal Justice.  Transcript from John Jay College of Criminal Justice, Umanzor Decl. Ex. A.

Third, Mr. Umanzor has demonstrated that he is medically capable of performing police work.  Dr. Babinski stated that Plaintiff's "neurological exam is normal…. He has no physical or cognitive restrictions with respect to his employment."  Dr. Kristin Babinski's Final Report dated July 8, 2015, Harman Decl. Ex. Z.  Further, the Deputy Chief Surgeon of the Medical Division of the NYPD, David I. Lichtenstein, M.D., concedes that there were no real physical issues and that the medical clearance letter from Dr. Babinski sufficed to clear Mr. Umanzor for service as an NYPD Cadet.  Lichtenstein Dep. 69:23—70:3, 80:17—81:5.  Dr. Lichtenstein also admits that Tecfidera, the medication Mr. Umanzor takes, is very effective. ("The newer immunomodulators have been found to be very effective… He should do very well and be asymptomatic for decades.").  Lichtenstein Dep. 137:8-16.  In fact, Dr. Lichtenstein testified that at the time Mr. Umanzor applied for the cadet program, there was nothing in his medical record or doctor's note that would disqualify him.  Lichtenstein Dep. 80:17—81:5. Thus, both at the time of his application and at present, Mr. Umanzor was and is physically and mentally qualified to serve as a NYPD Cadet.  Umanzor Decl. ¶ 58.

In an illuminating case, *Matter of State Div. of Human Rights on Complaint of Granelle*, 70 N.Y.2d 100 (1987), the New York Court of Appeals held under the New York State Human Rights Law, which tracks the ADA, it is unlawful for the City to reject an applicant for

employment where the City reasonably believed that that the plaintiff would become unable to perform police duties due to a greater than normal statistical probability of suffering from a future disability. *Id.* at 107. The court found that the plaintiff was presently able to perform the job, and stated that "employment may not be denied based on speculation and mere possibilities, especially when such determination is premised solely on the fact of an applicant's inclusion in a class of persons with a particular disability rather than upon an individualized assessment of the specific individual."

As in *Granelle*, Plaintiff could perform the job duties of a Cadet or Police Officer at the time he applied for the position, and still can today. Dr. Kristin Babinski's Final Report dated July 8, 2015, Harman Decl. Ex. Z; Randy Umanzor's deposition transcript, Harman Decl. Ex. Z at 75:25. Indeed, Dr. Lichtenstein admits that "if he's been asymptomatic since his application, if he has been tolerating his medication with no problems, I would qualify him today."[3] Lichtenstein Dep. 78:19-22. Plaintiff's condition has not changed in any relevant way since his application for employment. Umanzor Decl. ¶ 58.

In *Bayport-Blue Point School Dist. v. State Div. of Human Rights*, 131 A.D.2d 849 (Sup. Ct. 2nd Dep't 1987), the court found for the plaintiff under strikingly similar circumstances to the instant case. *Id.* There, a school district's physician disqualified the plaintiff from driving a school bus because she had been diagnosed with MS. *Id.* 849. As in the instant case, Defendant's doctor – who was not a specialist in neurology or MS – determined that the plaintiff was medically unqualified, despite testimony from the plaintiff's neurologist stating that she was fully capable of performing the job. *Id.* The court found that the defendant's termination was discriminatory, as plaintiff's MS did not prevent her from performing her job duties. *Id.* at 850.

---

[3] Plaintiff notes that Dr. Lichtenstein's understanding of the ADA is wrong. Whether an applicant is qualified is not based on the appearance of symptoms but whether he could perform the essential functions of the job with or without a reasonable accommodation. *See, e.g.*, *Sista*, 445 F.3d at 169.

6

Here, Defendant disqualified Mr. Umanzor in spite of reports by his MS Specialist, not because of any present inability to do the job or any risk to himself or others, but merely because Mr. Umanzor had been diagnosed with MS.  Notice of Disqualification, Umanzor Decl. Ex. H.

All evidence in the record confirms that Plaintiff was and is presently able to perform the essential duties of a Police Officer.  As such, Plaintiff is a qualified individual and satisfies the qualification element.

B. <u>Plaintiff's "failure" to disclose information in the medical review stage was not deceptive or intentional.</u>

Defendant makes two arguments as to why it believes Plaintiff was not "otherwise qualified" for the Cadet position.  First, Defendant argues that Plaintiff's "failure" to disclose requested medical information immediately disqualified him from serving in the Cadet Corps. Second, Defendant argues that Mr. Umanzor was disqualified due to a purported character failure, based on his "failure" to disclose medical information, which allegedly shows dishonesty to such a degree as to disqualify him for the position.  As discussed below, both of these arguments fail to establish summary judgment.

a. *Defendant's case law not not support the proposition that Plaintiff's "omissions" would have been grounds for immediate disqualification for the Cadet position.*

According to Defendant, "a failure to disclose requested information" is sufficient to disqualify a candidate.  Def.'s Mem. P. 7.  However, Defendant misstates the standard under which New York State courts find grounds for immediate disqualification.  Under Civil Service Law § 50(4)(f), a candidate becomes disqualified if he "intentionally made a false statement of any material fact in his application."  Further, Defendant's cases all fail to demonstrate the

proposition that minor, unintentional discrepancies – such as those at issue here – amount to grounds for immediate rejection or termination.

The facts in the instant case differ dramatically from the cases Defendant cites, which illustrate instances in which the applicant/petitioner was disqualified for deceptive and intentional omissions, such has hiding past felony convictions, arrests, and other serious misconduct, not for simple omissions regarding vitamins or other insignificant issues.  In *Urciuoli v. Department of Citywide Admin. Servs.*, 75 A.D.3d 427 (App. Div. 1st Dep't 2010), the petitioner "deliberately concealed his arrest in Jamaica in connection with charges that he possessed, was dealing in, and *tried to export a significant quantity of marijuana.*"  *Id.* (emphasis added).  In *Walsh v. Kelly*, 79 A.D.3d 552 (App. Div. 1st Dep't 2010), the court found after a hearing on the merits that petitioner concealed that he had been a suspect in a criminal homicide and had been previously disqualified by a different New York police department.  *Id.*  In *Dolan v. N.Y. State Dep't of Civ. Serv.*, 304 A.D.2d 1037 (App. Div. 3d Dep't 2003), the petitioner failed to mention that he had violated the terms of his post-conviction probation.  *Id.* at 1039.  In *Harrington v. City of New York*, 2013 NY Slip Op 31327(U), 2013 WL 3227781 (N.Y. Sup. Ct. N.Y. Co. 2013), the petitioner intentionally lied on his reinstatement application, answering in the negative the question "were any legal claims pending at the time you retired/resigned, or have any been initiated since, in which you were in any way concerned?"  However, the court denied reinstatement on other grounds, finding that because the "NYPD's regulations requiring follow-up inquiries to resolve discrepancies in a reinstatement application were not followed in this case, it was arbitrary and capricious for respondents to rely on the omission in petition's questionnaire, whether intentionally or negligently made, as a ground to deny him reinstatement."  *Id.* at 4.  In *Smith v. Ortiz,* 136 Misc. 2d 110 (N.Y. Sup. Ct. N.Y. Co. 1987), the

plaintiff lied about being treated for abnormal liver function caused by alcohol abuse and receiving treatment a residential facility for substance abusers. *Id.* at 111.  Finally, in *Flood v. County of Suffolk*, 820 F. Supp. 709 (E.D.N.Y. 1993), plaintiff was disqualified due to "falsification, character and illegal drug use." *Id.* at 712.  Additionally, the plaintiff in *Floods* admitted to using marijuana and cocaine in the past, lending money to a boyfriend so that he could purchase drugs, and driving while intoxicated, after having denied issues with drugs on her medical questionnaire. *Id.* at 711.  As such, Defendant failed to show that any failure or omission in the application process is grounds for immediate disqualification.

### b.  Plaintiff's "failure" to disclose does not render him "unqualified" or create grounds for immediate disqualification.

Defendant does not argue that Plaintiff failed to inform the NYPD of his MS diagnosis; rather, they strain to argue that Plaintiff – who had admitted having MS and made a good-faith effort to provide the NYPD with the information they requested – misled the NYPD through minor omissions on the NYPD's Applicant's Medical Questionnaire.  The questionnaire asks candidates to, *inter alia,* (1) list all medications taken in past 12 months (include steroids and/or hormone therapy), and (2) to indicate with an "x" in the appropriate box whether you now have or ever had a variety of medical condition.   Applicant Medical Questionnaire, Umanzor Decl. Ex. E.

Defendant claims Plaintiff was summarily disqualified from employment for (1) not disclosing that he had been prescribed Solu-Medrol, a steroid; (2) that he had been prescribed Vyvanse, a stimulant used to treat ADHD; and (3) that he was receiving periodic B12 injections and prescription strength Vitamin D pills; and (4) marking boxes slightly differently than in a form prepared for his doctor approximately a year earlier.

Defendant's assertions concerning Plaintiff's "omissions" regarding past medication fall flat.[4]  With respect to Solu-Medrol, Plaintiff was prescribed it in April 2013 – nearly a year before completing the form, and was on the steroids for only three to seven days.  Umanzor Decl. ¶¶ 44-45; Plaintiff's Prescription, Harman Decl. Ex. U.  He simply forgot that he had taken them, as he was only on them for a short period of time nearly a year prior.   Umanzor Decl. ¶ 43.  Further, Plaintiff ultimately did disclose he had taken steroids when he provided Defendant with his medical records.  Dr. Kristin Babinski's Final Report dated September 20, 2013, Harman Decl. Ex. P.  With respect to Vyvanse, Plaintiff never filled the prescription and never took Vyvanse.  Umanzor Decl. ¶¶ 46-47.  As such, Plaintiff did not fail to disclose anything.  With respect to Vitamins B12 and D, Plaintiff did not know that these vitamins were medication in this context, as vitamins are not generally considered drugs.  Umanzor Decl. ¶¶ 43, 49.  Also, Plaintiff ultimately did disclose he had taken vitamins when he provided Defendant with his medical records.  Plaintiff's Submitted Medical Records, Umanzor Decl. Ex. G.

With respect to Plaintiff's New Patient Information Sheet and Plaintiff's Applicant Medical Questionnaire, the assertion that any discrepancy between the two was due to a willful failure to disclose or dishonesty strains credibility.  New Patient Information Sheet, Umanzor Decl. Ex. B.  First, the two surveys each contain different items, as shown in the below chart:

| New Patient Information Sheet (April 25, 2013) | Applicant Medical Questionnaire (April 8, 2014) |
|---|---|
| Dizziness / vertigo | Fainting spells, blackouts, frequent dizziness, vertigo |
| Loss of hearing | Ear/hearing problems |
| Headache | Frequent headaches/migraines |

[4] Dr. Lichtenstein's contention that a candidate would be disqualified for failing to include a routine vitamin supplement on a list of medications is absurd, and belied by the fact that Defendant makes no mention that Plaintiff's questionnaire also "omitted" Motrin; Defendant cannot in good faith argue that neglecting to mention the use of a common household painkiller is grounds to be denied a career with the NYPD.

10

| Neck pain | Chronic neck, back pain, or injuries |
|---|---|
| Weakness | Pain or weakness in arms or legs |
| Clumsiness | *No similar item* |
| Involuntary movements | Epilepsy, seizures, fits, or convulsions |
| Difficulty walking | *No similar item* |
| Fatigue | *No similar item* |

Defendant's argument that Plaintiff's checking the boxes on the left in 2013 but not checking the boxes on the right in 2014 amounts to deceptive and intentional omission defies common sense. First, the majority of the items at issue on the Applicant Medical Questionnaire differs significantly from those in the prior medical form. In many cases the unchecked Applicant Medical Questionnaire include adjectives making the category more severe than on the New Patient Information Sheet: frequent headaches are not the same as headache; epilepsy, seizures, fits, or convulsions are not the same as involuntary movements; neck pain is not the same as chronic neck pain. Defendant's suggestion that checking one box while not checking the other is so heinous as to warrant immediate dismissal beggars belief.

Additionally, the surveys were completed approximately one year between, which is more than enough time for Plaintiff to have forgotten specific details of vague symptoms, or for his understanding of these conditions to have changed. Additionally, Plaintiff, hyper-vigilant in light of his ongoing diagnoses, over reported to his doctor any potential matter of concern.[5] Umanzor Decl. ¶¶ 23-25. Also, Plaintiff did not have the New Patient Information Sheet with him when he filled out the Applicant Medical Questionnaire, so he could not have checked whether his answers were consistent.

As such, Defendant's attempts to portray the Plaintiff as dishonest are not credible. Plaintiff in no way tried to conceal his medical condition from the NYPD. The medical form he completed indicated that he had been diagnosed with MS, and listed the medication he was

---

[5] If Plaintiff indicated to his doctor concern about a potential symptom only for his doctor to inform him that he was not in fact suffering from that symptom, he would not continue to report that symptom on future documents.

11

taking to treat it, Tecfidera.  When the NYPD asked for additional medical records and a doctor's note, Plaintiff provided them.  Umanzor Decl. ¶¶ 56-57;  Notice of Medical Review, Umanzor Decl. Ex. F;  Plaintiff's Submitted Medical Records, Umanzor Decl. Ex. G.

Defendant's characterization of Mr. Umanzor's "omissions" as "deception" and its focus on what it claims Plaintiff "chose" to omit, suggests that Defendant claims to believe Plaintiff intended to deceive the NYPD about his medical condition in order to meet the medical qualifications for the Cadet Corps.  Def. Mem. p. 2, 8-9, 20.  In context, this argument – that Plaintiff planned to mislead the NYPD into believing that he was medically fit by hiding the fact that he takes vitamin supplements while simultaneously admitting that he had MS – makes absolutely no sense.

Similarly, Defendant's contention that Plaintiff "deprived the NYPD Medical Division of the opportunity to make a complete assessment of Plaintiff's current medical condition" is nonsense.  Defendant had the medical documents it requested and the adequacy of those records was not an issue until months after the Plaintiff challenged Defendant's illegal decision to reject him.  Regardless, Defendant disqualified Plaintiff based on the record provided, determining that "the records Plaintiff[] submitted regarding his MS did not show a sufficiently long period of asymptomatic status prior to his application – in other words, an insufficient amount of time had passed to reasonably determine Plaintiff's risk of sudden relapse."  Def.'s Mem. p. 1.

Moreover, any argument that requires the Court to find intentional deception on the part of the Plaintiff is inappropriate for summary judgment, as it relies on the Court making findings of fact, i.e., that any discrepancies between medical disclosures and medical documents produced during discovery were the result of an intention to deceive.  Any inference drawn regarding those discrepancies properly should be resolved at trial.  Further, Defendant does not provide any

evidence of intentional "deception"; Defendant identifies discrepancies and jumps to the conclusion that they are the result of deception.

> ### c. *Defendant's argument that Plaintiff's "failure" to provide records suggests that he is dishonest fails as a matter of law*

As discussed above, the gist of Defendant's argument is that Plaintiff's "failure" to disclose medical records, regardless of whether it was immediate grounds for dismissal, was so intentionally deceptive that he is not "otherwise qualified" for police work for character purposes. Defendant does not provide any authority regarding a "regarded as disabled" plaintiff being unable to establish the "otherwise qualified" prong of the *prima facie* case due to a character "defect" or anything else that is not related to skill, experience, education or other job-related requirement. *EEOC v. Hussey Copper Ltd.*, 22 A.D. Cases (BNA) 1821 (W.D. Pa. Mar. 10, 2010) (recognizing that it was undisputed that applicant possessed the requisite experience, skill or education for the position sought even where he failed to disclose medication taken). Further, as this finding is also properly for a jury, Defendant's argument completely fails.

## C. Any "failure" to disclose only goes to damages, not liability.

Defendant cannot argue that these alleged deficiencies in Plaintiff's medical documentation were the reason for its rejection of Plaintiff; it is an undisputed fact that Defendant rejected Plaintiff because of his MS. Notice of Disqualification, Umanzor Decl. Ex. H. Defendant had no knowledge of any documentary deficiencies until months after they rejected Plaintiff. Accordingly, Defendant's alternative justifications for rejecting Plaintiff are after-acquired evidence: purported legitimate, non-discriminatory reasons to take an adverse action against an employee discovered after the adverse action was taken. Defendant's after-

13

acquired justifications cannot shield it from liability; as a matter of law, after acquired evidence does not bar a plaintiff from relief.

The U.S. Supreme Court's decision in *McKennon v. Nashville Banner Publishing Company*, 513 U.S. 352 (1995) makes clear that after acquired evidence defenses do not bar all liability. *Id.* "I would not accord with [the ADEA's remedial provisions] if after-acquired evidence of wrongdoing that would have resulted in termination operates, in every instance, to bar all relief for an earlier violation of the act." *Id.* At 358. This court continues to follow the Supreme Court's holding in *McKennon*. In *Altman*, the court held that "after-acquired evidence is relevant only with regard to the appropriate remedy..." *Altman v. New Rochelle Pub. Sch. Dist.,* No. 13-CV-3253 (NSR), 2014 WL 2809134 at *15 (S.D.N.Y. June 19, 2014).[6] Thus, Defendants cannot escape liability by relying on *ex post facto* justifications for denying Plaintiff employment. Defendant attempts to convince the Court otherwise must fail.

## II.   Defendant's "Direct Threat" Defense Fails.

Defendant argues that they made a medical judgment that Plaintiff was not otherwise qualified for the Cadet position because he would be a "direct threat" to himself and others; this argument must fail because it implicates numerous disputed material facts, and because Defendant failed to conduct a proper individualized assessment.

A "direct threat" is defined as "a significant risk to the health or safety of others that cannot be eliminated by reasonable accommodation." 42 U.S.C. § 12111(3). In order to be a significant risk, "the probability of significant harm must be substantial, constituting more than a remote or slightly increased risk." *Makinen v. City of New York*, 53 F. Supp. 3d 676, 694

---

[6]      *McKennon* and *Green v. Coach Inc.,* 218 F. Supp. 2d 404 (S.D.N.Y. 2002) address after acquired evidence in the context of ADEA and Title VII discrimination, however the same analysis applies to claims under the ADA, state, and local law. *See Ellis v. Cygnus Enters., LLC,* No. CV 11-771 (SJF) (AKT), 2012 WL 259913, at *3 (E.D.N.Y. Jan. 3, 2012).

(S.D.N.Y. 2014); *see also* 29 C.F.R. pt. 1630, app. § 1630.2(r).  The Supreme Court has further

explained that the exception can only be invoked where risk is significant "because few, if any,

activities in life are risk free … the ADA does not ask whether a risk exists, but whether it is

significant."  *Bragdon v. Abbott,* 524 U.S. 624, 632 (1998).  Individuals with disabilities cannot

be held to a higher standard of performance than nondisabled individuals.  *See* 42 U.S.C. §

12112(b)(3)(A).  Relevant evidence in determining whether a direct threat exists "may include

input from the individual with the disability, the experience of the individual with a disability in

similar positions, and opinions of medical doctors, rehabilitation counselors, or physically

therapists who have expertise in the disability involved and/or direct knowledge of the individual

with the disability."  29 C.F.R. Pt. 1630, App.  For the reasons below, Defendant's argument

fails because (1) it did not conduct an individualized assessment so cannot avail its self to the

"direct threat" defense and (2) there is a dispute of fact as to whether Plaintiff posed a high

probability of substantial harm to himself or others.

    A. <u>Defendant did not conduct an individualized assessment so cannot avail itself to the "direct threat" defense.</u>

    In this Circuit, an employer can only avail itself of "direct threat" defense if it conducted

"an individualized assessment of the employee's present ability to safely perform the essential

functions of the job based on a reasonable medical judgment that relies on the most current

medical knowledge and/or on the best available objective evidence."  *Makinen*, 53 F. Supp. 3d at

694 (citing *Sista v. CDC Ixis N. Am., Inc.,* 445 F.3d 161, 170 (2d Cir.2006)); 29 C.F.R. §

1630.2(f); *see also* N.Y. Comp.Codes R. & Regs. tit 9, § 466.11(g)(2)(ii).  An individualized

assessment involves a consideration of: "(1) [t]he duration of the risk; (2) [t]he nature and

severity of the potential harm; (3) [t]he likelihood that the potential harm will occur; and (4) [t]he

imminence of the potential harm."  *Id.* (quoting 29 C.F.R. § 1630.2(r)).  "A health care

professional ... [has] the duty to assess the risk … based on the objective, scientific information available to him and others in his profession.  His belief that a significant risk existed, even if maintained in good faith, [will] not relieve him of liability." *Bragdon*, 524 U.S. at 549.

Similar to here, in *Keith v. County of Oakland*, 703 F.3d 918 (6th Cir. 2013), the plaintiff, a deaf individual, filed a claim against the defendant, County of Oakland, when it failed to hire him as a lifeguard. The Sixth Circuit held that a cursory medical examination of plaintiff with little effort to determine whether the plaintiff could perform the essential functions of the position was not as a matter of law adequate for an individualized assessment.  *Id.* at 919.

As Defendant failed to conduct an individualized assessment, it cannot avail itself of the direct threat defense.

Here, it is undisputed that Dr. Lichtenstein failed to (1) to physically examine Plaintiff, (2) discuss Plaintiff's condition with the NYPD's neurological specialist or Plaintiff's treating neurologist, and (3) request any further documentation.  Umanzor Decl. ¶ 55; Lichtenstein Dep. 47:5-6; Lichtenstein Dep. 47:17—48:5; Lichtenstein Dep. 79:17-22; Babinski Aff. ¶ 15. Defendant concedes: "Due to the time, personnel and logistical issues inherent in the application process, it is not often feasible for the Medical Division to perform physical examinations or specific betters of tests to assess the current medical status of the candidate." Def.'s Mem. p. 6; Lichtenstein Decl. ¶ 29.  Defendant all but concedes that it did not conduct an individualized assessment.  As such, as a matter of law, it cannot now avail itself to the "direct threat" defense.

In the alternative, Defendant's argument still fails to entitle it to summary judgment where a court cannot say as a matter of law that a physical examination and review constituted an individualized assessment such that a defendant's decision that an applicant was a direct safety threat was objectively reasonable, a defendant has failed to establish that there are no

16

genuine issues of material fact regarding whether an applicant posed a direct threat.  29 C.F.R. §

1630.2(r); *Bragdon*, 524 U.S. at 625.  *See also EEOC v. Burlington Northern & Santa Fe Ry.,*

621 F. Supp. 2d 587 (W.D. Tenn. 2009) (denying summary judgment as to direct threat

exception where physician never personally examined the plaintiff).

  In *EEOC v. Hussey Copper Ltd.*, 696 F. Supp. 2d 505, 518 (W.D. Pa. Mar. 10, 2010), the

court held (1) where defendant could only speculate about possible future safety concerns, (2)

the defendant's doctor (i) did not meet with or personally examine the applicant (ii) ask about

applicant's experience regarding his disability's affect on cognitive functions, or (iii) speak with

the applicant's prescribing physician, "these circumstances alone raise material issues of fact."

*Id.* at 518.

### B. The "Direct Threat" Defense applies only to currently existing danger, not that which might occur in the future.

  Defendant also cannot avail its self to the "direct threat" defense based on speculation of

future harm.  A slightly increased risk, a mere speculative or remote risk is insufficient; there

must be a high probability of substantial harm.  29 C.F.R. § 1630.2(r).  Where a defendant only

bases its decision on the speculation that there may be future manifestations of symptoms, it has

not, as a matter of law, produced evidence supporting the contention that there is no issue of fact

as to whether an applicant posed a high probability of substantial harm to himself or others.

*EEOC v. Hussey Copper Ltd.*, 22 A.D. Cases (BNA) 1821, 520 (W.D. Pa. Mar. 10, 2010); *Dipol*

*v. N.Y.C. Transit Auth.*, 999 F. Supp. 309, 316 (E.D.N.Y. 1998) (rejecting direct threat defense

where "the only information on which Defendant based its action is the speculative conclusions

of [its doctors] and the possibility that there may be future manifestations of symptoms ... and

complications related thereto.").

Defendant misplaces reliance on *Fraterrigo v. Akal Sec., Inc.*, an unreported case decided prior to the implementation of the ADA Amendments Act of 2008. *Fraterrigo v. Akal Sec., Inc.*, 2008 WL 4787548 (Oct. 29, 2008). In *Fraterrigo*, the court found that defendant's policy against security officers with hearing aides was reasonable, as the possibility of a hearing aid failure would create a risk. *Id.* at 10-11. The court stated, "The ADA could not possibly force an employer to wait to take safety measures until after a dangerous situation actually occurs." *Id.* at 11. Here, Plaintiff's MS would not suddenly arise and create a safety risk, thus obviating the concern about waiting for a sudden danger at issue in *Fraterrigo*. Randy Umanzor's deposition transcript, Harman Decl. Ex. Z at 79:24—80:3; Dr. Kristen Babinski's letter dated July 8, 2015, Harman Decl. Ex. Y. Such a holding here would here would undermine the ADA, as it would allow defendants to discriminate against employees on the mere belief that they would become disabled.

Defendant also misplaces its reliance on *D'Amico v. City of New York*, 132 F.3d 145, 151 (2d Cir. 1998), a case that does not specifically address the direct threat defense, because *D'Amico* involves a relapse due to substance abuse, not a medical condition such as MS. In *D'Amico*, plaintiff was terminated after an extended period of regular cocaine use and failed rehabilitation. *Id.* The *D'Amico* court stated that "the likelihood of relapse is relevant to the determination of whether an individual is otherwise qualified, even if he is not a 'current' substance abuser." *Id.* at 157. (citation omitted). Defendant proffers no support that an MS relapse is analogous to an alcohol or cocaine relapse.

As noted *supra* § I A., Dr. Lichtenstein does not dispute that Plaintiff was physically fit to perform the job at the time of the limited assessment he made; Plaintiff was not a "direct

threat" to anyone at that time.  Lichtenstein Dep. 135:13-16.  As a result, Defendant's "direct threat" argument must fail.

C. <u>There is a dispute of fact as to whether Plaintiff posed a high probability of substantial harm to himself or others.</u>

Defendant's only evidence that Plaintiff was a "threat to himself and others" was Dr. Lichtenstein's conclusion that because "Plaintiff's numbness, dizziness, fatigue and memory loss would prevent him from performing" critical tasks, he was a threat to himself and others.  Dr. Lichtenstein, who is not an MS specialist or even a neurologist, came to that conclusion based solely upon reviewing Plaintiff's medical record.  In Plaintiff's medical record, Dr. Babinksi, an MS specialist and Plaintiff's treating neurologist, included notes of conversations she had with Plaintiff, during which Plaintiff described to her feelings that he purported to have experienced (numbness, dizziness, fatigue and memory loss).  Umanzor Decl. ¶ 35.  Dr. Lichtenstein credits Dr. Babinski's observations but ignores her conclusion that Plaintiff was fit to serve as a Cadet.  Lichtenstein Dep. 79:23—80:10.

Plaintiff's "symptoms" are so *de minimis* that this Court should not consider them at all.  Plaintiff only had brief "numbness" – not amounting to loss of use – in two fingers on his left, non-dominant hand.  Randy Umanzor's deposition transcript, Harman Decl. Ex. Z at 33:15.  It cannot be concluded that this numbness, which had passed around the time Plaintiff was disqualified from the Cadet Corps, would prevent him from "using a firearm, pursuing suspects, or performing any of the job functions of a Cadet.  Randy Umanzor's deposition transcript, Harman Decl. Ex. Z at 41:25—42:7, 43:10-13, 44:13-14.  Also, Dr. Lichtenstein was only "slightly concerned" about the "mild sensory loss in the fingers of the hand."  Lichtenstein Dep. 135:3-6.  Further, "Dizziness, "fatigue" and "memory loss" are incredibly vague symptoms that could affect anyone at any time.  At the time Plaintiff reported these symptoms, he was unsure

19

from what he may have been suffering and was extraordinarily vigilant in reporting potential symptoms to his doctor.  Umanzor Decl. ¶24.  He could not tell if he was actually experiencing these symptoms or they were just in his head.  *Id.*  He also reported to his doctor an example of "memory loss"—forgetting the lyrics to a song.  Umanzor Decl. ¶ 25.  Plaintiff's "symptoms" reported in the March 28, 2014, report are equally unpersuasive.  Plaintiff and his family had just been forced to move and Plaintiff was understandably disappointed by those events.  Umanzor Decl. ¶ 36.  That disappointment influenced his reporting of his "symptoms."  Umanzor Decl. ¶ 37.  In other words, those "symptoms" had nothing to do with his MS; Dr. Babinski did not alter her treatment.  Umanzor Decl. ¶ 38.  As such, the exhaustive list of Plaintiff's symptoms does not come close to making Plaintiff a "threat to himself and others."

Defendant's argument that "patients with long-term unfavorable course for their MS are more likely to have developed more lesions during the early years of the disease than those individuals who had a more favorable prognosis" is logically fallacious as it affirms the consequent.  There is nothing in the record suggesting that Plaintiff's MS is likely to progress.  Dr. Kristen Babinski's letter dated July 8, 2015, Harman Decl. Ex. Y;  Umanzor Decl. ¶ 78;  Randy Umanzor's deposition transcript, Harman Decl. Ex. Z at 46:16-17.  Although an individual with a worsening condition may have new lesions, the existence of new lesions is not dispositive on the issue of whether an individual with MS will become worse, let alone become disabled.  *Id.*

Plaintiff does, however, agree with Defendant in once respect: "where the issue to be decided is the likelihood that an event will occur, the fact that it did occur is perhaps the most probative evidence possible." *D'Amico*, 132 F.3d at 151.   As stated in *supra* § I. A., since Plaintiff's application, he has not suffered any relapses.  Umanzor Decl. ¶ 78;  Dr. Kristen

Babinski's letter dated July 8, 2015, Harman Decl. Ex. Y.  His health has not worsened.  Randy

Umanzor's deposition transcript, Harman Decl. Ex. Z at 46:16-17.  Dr. Babinski has not changed

his medication.  Umanzor Decl. ¶ 78.  He has not had any issues, whether physical or mental,

performing a variety of physically and mentally demanding jobs.  Umanzor Decl. ¶¶ 62-66.  Dr.

Kristen Babinski's letter dated July 8, 2015, Harman Decl. Ex. Y.  He even passed the

Department of Homeland Security's medical screening after being on medical review for his MS.

CBP Officer Candidate Fitness Test, Umanzor Decl. Ex. J.

### III.    Defendant's After-Acquired Evidence Defense Fails.

In addition to failing with respect to liability, Defendant's after-acquired evidence

defense fails to cut off back and front pay damages.  Defendant argues that Plaintiff's "failure" to

inform the NYPD of medications and "symptoms" he was experiencing, and to provide some

medical records constituted misconduct such that "if Plaintiff had been appointed to the Police

Cadet Corps and had his omissions and false statements to the Medical Division been later

discovered, Plaintiff would have been immediately disqualified from the Police Cadet Corps."

This argument fails on summary judgment because first, there are issues of fact whether

Plaintiff's "failure" rose to misconduct and second, upon a finding of misconduct, whether the

misconduct reached the standard set in *McKennon v. Nashville Banner Publ. Co.,* 513 U.S. 352

(1995), i.e., "misconduct … so grave that [employee's] immediate discharge would have

followed its disclosure in any event."  *Id.* at 883.  Further, this Court should not allow defendant

to avail itself of this defense, as it was not plead in its Answer.

To show that a plaintiff's damages should be limited under an after acquired evidence

defense, "an employer must establish that the wrongdoing was of such severity that the employee

would have been terminated on such ground alone if the employer had known of it at the time of

discharge." *Greene*, 218 F. Supp. 2d at 412 (internal quotations omitted).  "It is not enough for

the employer to show that the employee's misconduct could have been sufficient grounds for

termination; the employer must show that the misconduct 'would actually [have been a] . . . basis

for termination.'" *Mugavero v. Arms Acres, Inc.*, 680 F. Supp. 2d 544, 570 (S.D.N.Y. 2010)

(*Citing Greene,* 218 F. Supp. 2d at 413.). If the plaintiff, however, is able to "raise a material

issue of fact as to whether the after-acquired evidence would actually be a basis for termination,"

summary judgment is not appropriate.  *Kanhoye v. Altana, Inc.*, 686 F. Supp. 2d 199, 212

(E.D.N.Y. 2009) *(Citing Greene*, 218 F. Supp. 2d at 413.).

New York federal courts regularly deny motions to preclude or strike claims for back and

front pay where there is sufficient evidence from which a reasonable jury could find that a

plaintiff did not make misrepresentations, or that, even if he did, those misrepresentations would

not have been material to defendant's decision to hire plaintiff.  *See, e.g., Padilla v. Metro-N.*

*Commuter R.R.*, No. 88 CIV. 8659 (LMM), 1995 WL 431324, at *1 (S.D.N.Y. July 21, 1995),

*aff'd,* 92 F.3d 117 (2d Cir. 1996) (denying motion to strike where plaintiff allegedly committed

perjury at trial); *Kanhoye*, 686 F. Supp. at 212 (denying motion to preclude where plaintiff

admitted that he lied on his employment application); *Carroll v. Bayerische Landesbank*, 150 F.

Supp. 2d 531, 537 (S.D.N.Y. 2001) (denying motion to strike where defendant discovered a

contradiction between the firms listed on plaintiff's employment application and her resume);

*Flores v. Buy Buy Baby, Inc.*, 118 F. Supp. 2d 425, 433 (S.D.N.Y. 2000) (denying motion to

preclude upon finding that there remain material issues of relevant fact as to whether employer

would have fired plaintiff solely on the basis of her falsified employment application).  Here, as

described in *supra* § I. B., there is ample evidence from which a reasonable jury could find that

Plaintiff did not make misrepresentations, or that, even if he did, those misrepresentations would

not have been material to Defendant's decision to hire plaintiff.  Additionally, the NYPD's regulations require follow-up inquiries to resolve discrepancies in applications; therefore, it is unlikely that the minor discrepancies at issue would be grounds for immediate termination.  *See Harrington*, 2013 WL 3227781 (N.Y.Sup.) at *4 (stating that court would have annulled a determination denying reinstatement if the only ground cited was a misstatement or omission of a material fact where there was no follow-up inquiry to resolve the discrepancy).

Further, Defendant did not plead this defense in its Answer so it has been waived.  The after-acquired evidence defense is an affirmative defense.  *See, e.g., Quinby v. WestLB AG,* No. 04–CV–7406, 2007 WL 1153994, at * 16 (S.D.N.Y. Apr. 19, 2007).  Generally, the failure to plead an affirmative defense results in a waiver of that defense.  *See MBIA Ins. Corp. v. Patriarch Partners VIII, LLC,* 842 F.Supp.2d 682, 709 (S.D.N.Y.2012) (quoting *Travellers Int'l, A.G. v. Trans World Airlines,* 41 F.3d 1570, 1580 (2d Cir.1994)); *see also* Fed.R.Civ.P. 8(c) (requiring a defendant to "affirmatively state any avoidance or affirmative defense," in a responsive pleading).  Where the defense is raised at the first pragmatically possible time and applying it at that time would not unfairly prejudice the opposing party, waiver may not be proper.  *See Am. Fed. Grp., Ltd. v. Rothenberg,* 136 F.3d 897, 910 (2d Cir.1998).  Here, that is not the case.

Defendant failed to raise its after-acquired evidence defense at the first pragmatically possible time, and Defendant's delay unfairly prejudices Plaintiff.  Defendant had the records on which it now bases its after-acquired evidence defense since at least October 16, 2015, but it was not until it filed the instant motion on April 1, 2016, that it first raised the after-acquired evidence defense.  Defendant's letter dated October 16, 2015 (Docket No.: 31), Harman Decl. Ex. O.  Although discovery officially closed on October 9, 2015, the Parties continued to

exchange documents as late as February 1, 2016, when this Court issued the Stipulation and Protective Order.  (Docket No.: 47).  During those four months, had Defendant amended its Answer, Plaintiff could have requested an extension of the time for discovery; however, due to Defendant's delay, Plaintiff never had the opportunity to seek discovery regarding Defendant's hiring and firing practices as they pertain to errors, misrepresentations, and the like in employment applications.  Further, when Defendant did inform the Court that it received these documents, it never asserted that they would be used in an after-acquired evidence defense. (Docket No.: 32).  As such, Plaintiff could not have expected Defendant to use these documents in support of an affirmative defense it failed to include in its Answer.  Accordingly, Defendant has waived its right to the after-acquired evidence defense by not asserting it in its Answer or moving to amend its Answer before discovery closed.

## IV.   Plaintiff Withdraws His Request for Punitive Damages Against Defendant.

In light of Defendant's case law, Plaintiff withdraws its request for punitive damages.

## V.   It Is Against Equity To Dismiss Plaintiff's Claims Due To the NYPD Being a Non-Suable Entity.

New York federal courts regularly construe claims against New York City agencies, including the NYPD, as claims against the City of New York.  *See*, *e.g.*, *Cameron v. Coach Apparel Store,* No. 07 Civ. 3991(BSJ), 2009 WL 536068, *2 (S.D.N.Y. Mar. 3, 2009) (construing all claims against the New York Police Department as being claims against the City of New York); *Morales v. New York City Police Dept.,* No. 97 Civ. 7151(MGC), 1999 WL 169533, *1 (S.D.N.Y. Mar. 25, 1999) ("a case against the Police Department or any other non-suable agency of the City is really a suit against the City itself").  Accordingly, the Court should not dismiss Plaintiff's action, as the Court may construe the Complaint as against the City itself.

In the alternative, Plaintiff intends to request leave to amend the Complaint to include the City of New York as a party.  Defendant would not be prejudiced by an amended Complaint, as it would not change at all how this case has been litigated or will be litigated if Defendant's instant motion is denied.

As Defendants could have raised the issue months ago, there is no reason to dismiss this case on a technicality after more than a year of litigation.  As a matter of fairness, the Court should not dismiss Plaintiff's Complaint against Defendant on grounds that the NYPD is a non-suable entity.  This case has been litigated for approximately 17 months and now, for the first time and well after discovery has closed, Defendant argues that it is not a suable entity. Although Defendant is not clear in its memorandum of law pursuant to what rule it moves to dismiss the complaint, a motion to dismiss under Rule 12(b) of the Federal Rules of Civil Procedure must be made before a defendant's pleading.  Fed. R. Civ. 12(b).  As such, Defendant should have raised this defense well before its motion for summary judgment, and its dilatory request should be denied.

## CONCLUSION

Plaintiff has established that there are genuine issues of material fact that require that the Court deny Defendant's motion.  As such, this Court must find as a matter of law that Defendant is not entitled to summary judgment and deny its motion for summary judgment.

Dated: New York, New York     Respectfully submitted,
   April 29, 2016

          By:  s/ Walker G. Harman, Jr.
             Walker G. Harman, Jr. [WH-8044]
             Edgar M. Rivera [ER-1378]
             220 Fifth Avenue, Suite 900
             New York, New York, 10001
             *Attorneys for Plaintiff*